# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ALAN CRAIG WOOD,

Defendant-Appellant.

FOR PUBLICATION
October 28, 2014
9:05 a.m.

No. 315379
Oakland Circuit Court
LC No. 2012-240805-FC

Before: BOONSTRA, P.J., and MARKEY and K. F. KELLY, JJ.

BOONSTRA, P.J.

Defendant appeals by right his convictions of alternative counts of first-degree premeditated murder, MCL 750.316(1)(a), and first-degree felony murder, MCL 750.316(1)(b), larceny in a building, MCL 750.360, and two counts of possessing, retaining, secreting, or using financial transaction device, MCL 750.157n(1). The trial court sentenced defendant as a fourth habitual offender, MCL 769.13, to concurrent terms of life in prison without parole for one count of first-degree murder supported by two theories, 46 months to 15 years for the larceny conviction, and 34 months to 15 years for each financial transaction device conviction.[1] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant was convicted of killing 80-year-old Nancy Dailey and stealing her credit cards from her home on November 20, 2011. The prosecutor had charged Tonia Michelle Watson as a codefendant with first-degree felony murder, larceny in a building, and stealing a financial transaction device. On December 21, 2012, Watson pleaded guilty to second-degree murder, MCL 750.317, larceny in a building, and unlawfully taking a financial transaction device. Watson testified against defendant at trial.

On November 20, 2011, Dailey's cousin, Leah Storto, and a neighbor, whom Storto identified as Steve, discovered Dailey's lifeless body and called 911. Police officers who arrived

---

[1] The trial court ordered that defendant serve the sentences consecutively to a sentence for which he had received parole from prison.

at Dailey's home described finding different areas of the home ransacked and her body bound and bloody in her bedroom. The autopsy revealed bruising on Dailey's face, neck, chest, upper right back, the back of her left hand, her left wrist, and one of her ears; bruising and linear scrapes near her neck; "multiple sharp force injuries . . . consist[ing] of a [seven- to eight-inch] stab wound on the right side of the neck" that severed Dailey's carotid artery and jugular vein, and a five-inch "slashing wound in the front of the neck"; "a small nick on [Dailey's] left thumb"; and "some petechiae [pinpoint hemorrhages] on [her] cheeks, forehead and in the lower [eye]lids," which often appears in instances of ligature or manual strangulation. Her death was ruled a homicide.

Dailey's neighbor, Lois Hillebrand, identified defendant at trial as the man who had approached her on a Saturday in early November 2011 about raking her leaves, and whom Hillebrand saw raking Dailey's leaves the next day. Another neighbor, Marie Hesczuk, testified that a couple of weeks before Dailey's death, she saw a white man and a white woman raking leaves in Dailey's front yard, and the man "highly resemble[d]" defendant. She also testified that while outside raking her neighbor's leaves directly across the street from Dailey's house on November 20, 2011, she saw Dailey through her front window between 5:00 and 5:30 p.m., and also noticed an unfamiliar man walking past Dailey's house wearing a dark hooded sweatshirt and dark pants. Another witness, Michael Wilson, identified defendant as a man he saw in an alley near Dailey's house at 5:30 p.m. on November 20, 2011.

## A. WATSON'S TESTIMONY CONCERNING DAILEY'S MURDER

Watson testified about her participation with defendant in Dailey's killing. Watson identified defendant in court as her boyfriend since November 2010. Watson also testified that she had regularly used cocaine and heroin for 25 years, and that during her relationship with defendant, he regularly used marijuana and cocaine. Watson recalled that she and defendant met Dailey in early November 2011, when Dailey paid them $40 for raking leaves in her yard.

According to Watson, she and defendant were homeless in November 2011, struggling to pay for drugs and food, and living in different hotels or motels, primarily the Seville Motel on Woodward Avenue in Royal Oak south of 12 Mile Road, but also at other lodging on Woodward Avenue, including the De Lido Motel south of 8 Mile Road. Watson testified that on November 20, 2011, she and defendant checked out of their hotel because they "didn't have any money," and spent the day at a McDonald's restaurant located at Woodward Avenue and 13 Mile Road.[2] According to Watson, defendant raised the idea of robbing Dailey, and she concurred in this idea due to their dire financial straits. Watson testified that they left the restaurant, waited until dark, walked toward Dailey's house, "walked around the block a couple times," noticed Dailey inside, and ascertained that a door was unlocked. Defendant then entered a side door and told Watson to go inside.

---

[2] The prosecutor introduced still photos and surveillance video depicting the Royal Oak McDonald's as of approximately 1:30 p.m. on November 20, 2011, and two police officers testified that defendant appeared in the images wearing clothing similar to the clothes he was wearing at the time of his arrest.

Watson testified that defendant told Dailey "that this was a robbery." Defendant took from Dailey's living room a passport and a cellular phone; Watson took Dailey's purse and removed some money. After Dailey voiced a desire to use the bathroom, defendant instructed Watson to stand outside the open bathroom door, and Watson asked Dailey to give defendant "the ATM numbers to the credit cards"; defendant then searched Dailey's bedroom for valuables. When Dailey tried closing the bathroom door, defendant grabbed Dailey's hair, threw her to the ground, and dragged her into her bedroom by her hair. Defendant repeatedly punched Dailey's face, repeatedly stomped on Dailey's neck, twisted Dailey's neck with his hands, and then bound Dailey's hands with a scarf. Defendant showed Watson a knife before returning to Dailey's bedroom. Watson looked through Dailey's bedroom for jewelry. She observed Dailey lying by her closet and observed that she was not making any noise; Watson did not touch her. Watson left the house with Dailey's purse, containing an identification card and a wallet holding a Visa debit card and other credit or debit cards, while defendant left with jewelry and the cell phone and passport. A short time later, Watson observed that, in an area near the Seville Motel and a bus stop, defendant stomped into the ground in the Woodward Avenue median the knife he had used to cut and stab Dailey's throat.[3]

Watson testified that after 7:30 p.m. on November 20, 2011, she checked into the Seville Motel, and that defendant discarded Dailey's cell phone on the motel roof and discarded other personal items from Dailey's purse elsewhere at the motel. Watson recalled that she found inside Dailey's purse a Visa debit card and an apparent pin number, that she asked defendant to try using the card, and that defendant left around 7:45 p.m. and returned with $200 in cash that he had withdrawn using Dailey's card. Watson recounted that she then unsuccessfully tried withdrawing money at a bank near the hotel while wearing a bandana over her face and in defendant's company, and that during a bus ride to Pontiac, defendant later unsuccessfully tried using the card at a Mobil gas station. In Pontiac, defendant and Watson bought cocaine and heroin, and they then returned to the Seville Motel. Defendant walked past Dailey's house again that evening and noticed it "lit up like a Christmas tree," which prompted Watson's and defendant's relocation to the De Lido Motel.

Watson testified that on November 21, 2011, defendant put Dailey's passport, debit card, and other cards in a bag and left them under some trees near the De Lido Motel, that she and defendant left the De Lido Motel[4] and bought drugs in the Cass Corridor, and that Watson then checked them into a Westland lodging called the Paradise Hotel. Watson recalled that she and defendant walked toward a Meijer store in Canton, and along the way defendant discarded behind a Wal-Mart store a suitcase and a backpack that contained some of their clothing and a

---

[3] Multiple officers testified that they recovered a knife from the Woodward Avenue median near a bus stop across from the Seville Motel.

[4] Royal Oak Police Lieutenant Mike Frazier testified that with Watson's assistance, he found a red rag and a clear plastic bag between some trees and under some leaves near the De Lido Motel. The bag contained a wallet with Dailey's Visa debit card, Dailey's state identification card and passport, and other cards. Frazier testified that he also recovered paperwork bearing the name Christina Duchamp, one of defendant's prior theft victims, in the same location.

knife that defendant had stolen from the house where he had worked in September 2011.[5] Watson testified that she and defendant had intended to find another elderly woman to rob, but police arrested them at the store. According to Watson, when she and defendant were arrested, defendant had injuries on his hand that she first noticed after they left Dailey's house on November 20, 2011.[6] Watson testified that, on November 23, 2011, she voluntarily provided lengthy statements to two detectives, in which she revealed her and defendant's involvement in Dailey's death, the locations where "certain items could be located[,]" including the knife defendant used and some of Dailey's belongings, and that she accompanied the police to assist them in finding several items.

## B. DNA TESTING

Amy Altesleben, an expert in DNA analysis, testified at defendant's preliminary examination[7] that she received for analysis samples from a blue scarf, Dailey's nail clippings, a bloody washcloth found in Dailey's house, a sample of Dailey's blood, defendant's jeans and sweatshirt, and known samples from defendant and Watson. Altesleben determined that the blue scarf sample contained a DNA mixture from at least four contributors. She could not identify "a major donor in that sample," and could not exclude defendant as a contributor. In analyzing the nail clippings from Dailey's right hand, Altesleben explained that she found a mixture of DNA from at least two contributors; she could not identify major and minor donors; and she could not "make any conclusive determinations regarding [defendant's] DNA as being a contributor to this profile[.]" However, "a Y DNA type was detected on this sample which would indicate that at least one of the donors must be male." Altesleben forwarded these items to forensic scientist Heather Vitta for "Y-STR DNA testing."

Vitta, an expert in DNA analysis including Y-STR DNA testing, testified about her performance of Y-STR DNA analysis on the samples from the blue scarf and Dailey's right-hand nail clippings, as well as a known sample from defendant. Vitta explained that Y-STR DNA

---

[5] Canton Township Officer James Marinelli testified that, at the request of the Royal Oak Police Department on December 1, 2011, he assisted in searching for a suitcase in "a wooded area behind" a Wal-Mart store on Ford Road. Marinelli observed 25 feet into the woods "a black suitcase leaned up against a tree with sticks and some large pieces of bark laying [sic] on top of it." Canton Police also located "a gray and black shoulder bag . . . lying underneath the black suitcase." Marinelli testified that the suitcase contained female clothing and hygiene products, prescriptions bearing the name Tonia-Sledewski-Watson, and "paperwork . . . with the name Tonia Michelle Sledewski." The suitcase also contained a red bag holding "papers with the name Alan Wood on them" and "a picture I.D. card with the name Alan Wood." Officer Marinelli recalled that the shoulder bag contained "envelopes of . . . miscellaneous papers" and the knife that Sarah Paruch testified had gone missing when defendant worked in her house.

[6] The Royal Oak Police Sergeant who booked defendant on November 22, 2011 testified that defendant's left hand had "scabbing in the area of the knuckles."

[7] This testimony was introduced at trial; see Part V for our discussion of defendant's challenge to the admission of this testimony.

testing focused on areas of only the Y chromosome and proved useful in isolating male donors to samples that also contained quantities of female DNA, and that scientists referred to the Y chromosome profile produced in Y-STR DNA testing as a "haplotype." Regarding the blue scarf sample, Vitta testified that she identified the DNA of "up to three males," and that "a major male contributor to the scarf" existed. Regarding the sample from Dailey's right-hand nail clippings, she testified that she identified the DNA of two males, and "a major male donor" also existed in this sample. According to Vitta, the major male haplotypes in the scarf and nail clipping samples matched one another and the haplotype she identified from defendant's known sample; this match signified to Vitta that she could not exclude defendant as the contributor to the major male haplotypes on the scarf and nail clipping samples.[8] Vitta entered into a database the major male haplotypes she identified in the scarf and nail clipping samples, applied a 95 percent confidence limit, and yielded the following frequency results: (1) with respect to the major male haplotype in the scarf sample, the haplotype frequency was estimated as one in 1,923 in the Caucasian male population, one in 1,558 in the African-American male population, and one in 1,005 in the Hispanic male population; and (2) with respect to the major male haplotype in the nail clipping sample, the haplotype frequency was one in 2,342 in the Caucasian male population, one in 2,105 in the African-American male population, and one in 1,145 in the Hispanic male population.

## C. OTHER ACTS EVIDENCE

Before trial, the prosecution filed a motion to admit, under MRE 404(b)(1), evidence of multiple other acts, including (1) defendant's theft of a purse from his 77-year-old landlady, Joanne LaBarge, in October 2011; (2) his multiple acts of theft between October 2010 and October 2011 from the shared Royal Oak home of two disabled women, Christina Duchamp and Nancy Foerster, who had hired defendant to work around their house; and (3) in September 2011, defendant's theft from a Berkley home where he was working for Joseph Paruch. Following a hearing held on June 13, 2012, the trial court entered an opinion and order, dated June 18, 2012, admitting the other acts evidence. The trial court ruled, in relevant part:

> The Court finds the proffered evidence to be admissible under MRE 404(b). First, the Court finds the "other acts" evidence is being offered for proper purposes. Here the evidence is for the purposes of proving (1) that Defendant intended to kill or cause great bodily harm[,] (2) that Defendant intended to commit the crime of Larceny, (3) that Defendant acted with premeditation and deliberation, (4) that Defendant had a motive to commit the crimes charged, (5) that Defendant acted pursuant to a common scheme, plan, or

---

[8] Vitta cautioned that "with Y-STR analysis because we're not looking at all of the chromosome DNA it is more limited in its ability to tell the difference between one male and another male and it's not considered a unique identification." Vitta added that because men inherited their "male Y chromosome all the way down the line," a man "could have [male] cousins that would have the same haplotype as you," and it was possible "to have a completely unrelated male share the haplotype."

system, and (6) that co-Defendant Tonia Michele Watson is not fabricating the incident. All of these are proper purposes.

Concerning MRE 403, the court concluded that "the proffered similar acts are highly probative on the issue of whether Defendant committed the charged acts," and rejected the position that the risk of unfair prejudice "substantially outweigh[ed] its probative value."

At trial, Joseph Paruch testified that he and his wife and daughter lived in Berkley in September 2011. Paruch identified defendant as the man who had approached him at a Home Depot store in early September 2011 to inquire whether he "had any odd jobs for him to do." Later the same day, Paruch drove defendant to his house to show defendant a bathroom that he wanted remodeled, and defendant agreed to perform the work. Between September 13, 2011 and September 22, 2011, defendant worked for approximately three hours a day after Paruch or his wife arrived home and could supervise defendant, and Paruch paid defendant in cash. Paruch recalled that, on September 22, 2011, defendant for the first time failed to appear for work. Paruch noticed that a portion of the bed in his bedroom was out of place; searching the room, he discovered that a .32 caliber handgun and a jar of medical marijuana were missing. Paruch reported the theft to the Berkley Police. Later that day, defendant called Paruch to tell him that he had not "come to work because he was making arrangements to get a new apartment." Defendant never returned to finish the job. A couple of weeks later, Paruch received a call from the Berkley Police, which prompted him to undertake additional searching in his bedroom, and he noticed that a knife was missing from his bedroom nightstand. Paruch acknowledged that defendant had not been charged with a crime relating to the theft from his house.

Sarah Paruch, Joseph Paruch's daughter, also identified defendant at trial as the man her parents had hired to work in their house. Sarah testified that, on September 22, 2011, after having a discussion with her father about some items missing from the house, she became suspicious about a knife missing from a desk in her bedroom. When a detective called her, she became certain that her knife had also been taken. She added that defendant once helped her perform a task in her bedroom, and she "notice[d] him looking around her bedroom" enough to make her suspicious and uncomfortable. Sarah denied having filed a complaint relating to her missing knife.

Watson testified that in September 2011, defendant told her about his Home Depot meeting with Joseph Paruch and his work on a bathroom at the Paruchs' house. Watson recounted that at some point around September 2011, she observed defendant in possession of "a black bag that had a gun in it," two knives, and "two bags of marijuana and quarters," none of which belonged to him. Watson recalled defendant having advised her that he had obtained the property from the Paruchs. According to Watson, defendant sold the handgun. Watson identified the knives at trial and testified that defendant usually carried the straighter knife with him. The Paruchs also identified the knives as those that had been stolen from them.

Watson testified that in February 2011, she became acquainted with Royal Oak residents Christina Duchamp and Nancy Foerster through defendant. Watson and defendant both did work at the house where Duchamp and Foerster lived and received payment for their work. In Watson's estimation, Duchamp had a physical disability, and Foerster had mental and physical disabilities. Watson recalled that, in approximately late June 2011, Duchamp informed

defendant about money and other property missing from the house and "that they just didn't need . . . his help anymore." Watson confirmed that defendant stole money, pain pills, and silver from the house. In October 2011, defendant told Watson that he went to Duchamp's and Foerster's house, but that Duchamp reiterated that they didn't want him to work for them anymore. Watson described how, later in October 2011, she and defendant took a bus to Duchamp's and Foerster's house at 5:00 a.m. intending to steal from them. They that knew Duchamp and Foerster would be home. Defendant brought with him a baseball bat and went inside alone through a window. He then came outside with a red purse that contained a credit card in Duchamp's name, and around 9:00 a.m. on October 12, 2011, she and defendant bought groceries from a Meijer store. Watson paid for the groceries using Duchamp's credit card. When asked whether defendant had discussed his intentions while inside the house, Watson answered that defendant "had thought about tying them up and putting them in the basement and trying to get money from the pin numbers . . . [of] their credit cards," and "[s]etting the house on fire."

Watson further testified that, in October 2011, she and defendant lived together in a Pontiac rental home. Watson characterized their 76-year-old landlady, LaBarge, as "a nice lady" who "was . . . very patient with [her and defendant] as far as getting the rent," letting them move in without a deposit, and coming "by to check on us." Once, when Watson and defendant visited LaBarge's house, Watson saw defendant take LaBarge's purse out of a chair, and she and defendant "went out back and looked through the contents." Watson remembered that she and defendant had discussed "going into her home [to steal again], but that [defendant] said that it would be noticeable because" LaBarge lived on a main street.

The jury convicted defendant as described above. This appeal followed.

## II. ADMISSION OF OTHER ACTS EVIDENCE

Defendant argues that the trial court's admission of other acts evidence violated MRE 404(b)(1), which prohibits the admission of evidence of a defendant's other acts or crimes when introduced solely for the purpose of showing the defendant's action is in conformity with his criminal character. *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000). We disagree. We review a trial court's ruling on the admission of evidence for an abuse of discretion; however, we review de novo preliminary legal issues regarding admissibility. *People v Jambor (On Remand)*, 273 Mich App 477, 481; 729 NW2d 569 (2007).

MRE 404(b)(1) provides in relevant part:

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Evidence of a defendant's other acts or crimes is admissible under the following circumstances: (1) the prosecutor offers the evidence for a proper purpose under MRE 404(b)(1); (2) the other acts evidence satisfies the definition of logical relevance within MRE 401; (3) any unfair prejudice arising from the admission of the other acts evidence does not substantially outweigh its probative value, MRE 403; and (4) on request, the trial court can read the jury a limiting instruction that describes the proper consideration of the other acts evidence. *People v Starr*, 457 Mich 490, 496; 577 NW2d 673 (1998); *People v Ackerman*, 257 Mich App 434, 439-440; 669 NW2d 818 (2003).

We conclude that the trial court acted within its discretion in admitting the other acts evidence for several relevant, non-character purposes. The evidence of defendant's other thefts admitted at trial was relevant to proving several elements of the offenses with which defendant was charged. First, all three other acts of defendant's theft, from the Paruch house in September 2011, from the residence of Duchamp and Foerster in October 2011, and from LaBarge's house in October 2011, reasonably tended to make it more likely than not that he intended to commit larceny from Dailey's house in November 2011, an element of the present larceny from a building charge against defendant. MRE 401; MCL 750.360; *People v Sykes*, 229 Mich App 254, 278; 582 NW2d 197 (1998). Second, the evidence of defendant's theft from Duchamp and Foerster, and specifically his carrying of a baseball bat inside their house and his statements about tying them up, placing them in the basement and setting their house ablaze, reasonably tended to make it more likely than not that defendant either intended to kill or inflict great bodily harm on Dailey in November 2011, an element of the first-degree felony-murder charge, MRE 401; MCL 750.316(1)(b); *People v Comella*, 296 Mich App 643, 651-652; 823 NW2d 138 (2012), or premeditated and deliberated the killing of Dailey in November 2011, an element of the first-degree premeditated murder charge. MCL 750.316(1)(a). Watson's testimony that defendant carried into Dailey's house a knife that he stole from the Paruch house also tends to prove the elements of premeditation and deliberation. *People v Coy*, 243 Mich App 283, 315-316; 620 NW2d 888 (2000).

Additionally, a large portion of the other acts evidence was admissible to show the existence of a common plan, scheme, or system. "[E]vidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *Sabin (After Remand)*, 463 Mich at 63. "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." *Id*. at 65-66 (internal quotation and citation omitted). "[E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts." *Id*. at 66 (internal quotation and citation omitted).

The bulk of the other acts evidence also shared several common features with the offenses in the instant case. The evidence regarding Duchamp and Foerster demonstrated that defendant targeted vulnerable women, specifically that he became acquainted with Duchamp and Foerster, two disabled women, by offering to work around their home. Similarly in this case, he became acquainted with Dailey, an 80-year-old woman who lived alone, by offering to work

around her house. In each case, he returned to the homes of the vulnerable women intending to steal from them and armed himself with a weapon, a baseball bat in October 2011, and a knife in this case. On each occasion, defendant stole purses and bank cards from the vulnerable women. A jury could reasonably infer that defendant employed a common plan, scheme, or system to achieve his acts of targeting and stealing from Dailey, Duchamp, and Foerster, notwithstanding that defendant did not physically harm Duchamp or Foerster. *Sabin (After Remand)*, 463 Mich at 63-66. Regarding defendant's thefts from LaBarge, defendant again targeted a vulnerable and elderly woman for theft, entered her home, and stole purses or wallets. A jury reasonably could infer that defendant employed a common plan, scheme, or system to achieve his acts of targeting and stealing from Dailey and his landlady. *Id.* We find no abuse of discretion in the trial court's admission of this evidence.

Further, some of the other acts evidence would have been admissible even without resort to MRE 404(b). Without analyzing admissibility under MRE 404(b), a court may admit "[e]vidence of other criminal acts . . . when it explains the circumstances of the crime." *People v Malone*, 287 Mich App 648, 662; 792 NW2d 7 (2010). The evidence of defendant's prior theft from the Paruch home helped explain where he acquired the knife he used in assaulting Dailey. Further, Watson's testimony about defendant's possession of a knife he stole from the Paruch house and his use of the knife in killing Dailey constituted direct, relevant evidence supporting the murder charges. *People v Hall*, 433 Mich 573, 580-581; 447 NW2d 580 (1989).

Regarding unfair prejudice, defendant fails to offer any specific example of unfair prejudice or other basis for exclusion under MRE 403. In light of the probative value inherent in the other acts evidence toward proving multiple relevant matters, and the limiting instruction that the court read to the jury concerning its proper consideration of the other acts evidence, we do not find that the danger of "unfair prejudice, confusion of the issues, or misleading the jury" substantially outweighed the probative value of the evidence, MRE 403. *Starr*, 457 Mich at 503, see also *People v Magyar*, 250 Mich App 408, 416; 648 NW2d 215 (2002) (observing that "a limiting instruction such as this one that cautions the jury not to infer that a defendant had a bad character and acted in accordance with that character can protect the defendant's right to a fair trial").

We find no error in the trial court's admission of other acts evidence.

### III. PROSECUTORIAL MISCONDUCT

Defendant next argues that the prosecution engaged in misconduct in its opening statement by vouching for the credibility of Watson, and that the trial court erred in not granting his motion for a mistrial. We disagree. This Court "review[s] claims of prosecutorial misconduct case by case . . . to determine whether the defendant received a fair and impartial trial." *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001). We review a trial court's decision regarding a motion for a mistrial for an abuse of discretion. *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010).

A prosecutor may not vouch for the credibility of his witnesses "to the effect that [s]he has some special knowledge concerning a witness'[s] truthfulness." *People v Bahoda*, 448 Mich 261, 273-274; 531 NW2d 659 (1995), reh den 448 Mich 1225 (1995). However, merely "by

calling a witness who testifies pursuant to an agreement requiring him to testify truthfully, the Government does not insinuate possession of information not heard by the jury and the prosecutor cannot be taken as having expressed his personal opinion on a witness'[s] veracity." *Id*. at 276.

During opening statements, the prosecution addressed Watson's testimony as follows:

You are also going to hear from Tonia Watson in this case. And I'm sure that the defendant is going to do everything he can to make her look like a liar. So be prepared for that.

She's going to testify as a witness for the prosecution because aside from Nancy Dailey and the defendant she's the only one that knows what happened in that house that night.

Now you are going to hear about her role that she played in the crimes that were committed because like I said she was not completely innocent.

You're going to hear that she's a thief. You're going to hear that her fingerprint was found on a jewelry case, on a jewelry box that was found in Nancy Dailey's bedroom on a dresser.

You're also going to hear that she was originally charged not with first degree premeditated murder, but she was charged with felony murder for the role that she played in assisting and committing the larceny that was the underlying offense for the felony murder.

She was also charged with larceny in a building and she was also charged with the financial transaction device for the one that she attempted to use that card that we know of.

You're going to hear that as a result of her coming in this court testifying before you and it's conditioned upon the prosecutor believing that she's testifying truthfully she will get a reduced charge. She will be pleading to second degree murder, larceny in a building and financial transaction device. She will serve a minimum—

Defense counsel objected on the ground that the prosecution's comments constituted improper vouching for the witness. The trial court re-instructed the jury that the opening statements of attorneys were not evidence and that the trial court would provide the jury with the applicable law. Defendant moved for a mistrial based on the prosecution's comments; the trial court denied the motion.

Our review of the trial court record convinces us that the prosecution's reference to Watson's plea agreement did not embody an inappropriate "suggest[ion] that the government had some special knowledge, not known to the jury, that the witness w[ould] testify truthfully." *Bahoda*, 448 Mich at 276. Further, even if the prosecution's statements were improper, the trial court's instructions, which emphasized that the prosecution's opening statement was not

-10-

evidence and the jury alone had the responsibility to determine witness credibility, cured any potential prejudice. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008) (observing that curative instructions sufficed "to cure the prejudicial effect of most inappropriate statements, and jurors are presumed to follow their instructions"). Therefore, the trial court acted within its discretion in denying defendant's motion for a mistrial. *Schaw*, 288 Mich App at 236.

## IV. ADMISSION OF Y-STR DNA TESTING EVIDENCE

Defendant next argues that the trial court erred in admitting the testimony of the prosecution's experts, concerning Y-STR DNA testing, either because it should not have been admitted pursuant to MRE 702, or otherwise because it should have been excluded under MRE 403. We disagree. This Court reviews for an abuse of discretion a trial court's qualification of an expert witness and its ultimate ruling regarding whether to admit expert testimony. *Unger*, 278 Mich App at 216.

MRE 702, which governs the admissibility of expert testimony, provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A trial court "may admit evidence only once it ensures, pursuant to MRE 702, that expert testimony meets that rule's standard of reliability." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004), reh den 472 Mich 1201 (2005), cert den 546 US 821; 126 S Ct 354; 163 L Ed 2d 63 (2005). "When evaluating the reliability of a scientific theory or technique, courts consider certain factors, including but not limited to whether the theory has been or can be tested, whether it has been published and peer-reviewed, its level of general acceptance, and its error rate if known," *People v Kowalski*, 492 Mich 106, 131; 821 NW2d 14 (2012), and "the existence and maintenance of standards controlling the technique's operation." *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 594; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

> MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology. [*Gilbert*, 470 Mich at 782.]

The trial court need not "admit only evidence that is unassailable," or investigate "whether an expert's opinion is necessarily correct or universally accepted." *Unger*, 278 Mich App at 218 (internal quotation and citation omitted).

Here, the trial court held a *Daubert* hearing, wherein Julie Marie Ferragut testified that she had worked since January 2003 as "a senior DNA analyst" at Bode Technology, "a private forensic DNA laboratory." Ferragut further testified as to her academic and scientific credentials, and explained that her job involved performing "DNA testing on forensic evidence samples" for a company that did DNA testing for backlogged law enforcement agencies, and defense attorneys and the Innocence Project, to identify victims of mass disasters, and to add convicted offender profiles to a database. Ferragut estimated that Bode Technologies had processed 1.4 million DNA profiles for the convicted offender database. Ferragut testified that she completed twice yearly proficiency testing for both autosomal STR DNA testing and Y-STR testing.[9] Ferragut further testified that Bode Technologies had received accreditations from "the American Society of Crime Lab Directors, the Lab Accreditation Forum, . . . forensic Quality Services, and . . . the New York State Department of Health."

Ferragut testified that for approximately 10 years she had undertaken autosomal STR DNA testing, and for seven years had performed Y-STR DNA testing in approximately one or two percent of her caseload. Ferragut completed training programs on both forms of DNA testing. Ferragut also confirmed that she had testified as an expert in 32 jurisdictions, including Michigan; on each occasion courts admitted her testing results; at least eight times she had testified about Y-STR DNA testing, including in Michigan in 2007; and her testimony about Y-STR DNA testing occurred on behalf of both the prosecution and the defense. The trial court qualified Ferragut as "an expert in DNA analysis, including Y-STR." According to Ferragut, approximately 2,000 peer reviews of Y-STR DNA testing documented its general acceptance as reliable within the scientific community, and her own experience with Y-STR DNA testing established that it "produce[d] accurate and reliable results."

Ferragut explained that the Y-STR DNA analysis involved testing DNA only on the Y-chromosome, and Y-STR DNA testing could not uniquely identify an individual because "a given male is going to have the same Y-STR profile as his father . . . and grandfather." As one situation in which Y-STR testing might prove useful, Ferragut identified "that with mixtures of male and female DNA, a lot of times the female DNA can overwhelm the male DNA or . . . mask the male DNA altogether, so with using Y-STR's, we're able to target the male DNA without any kind of interference from the female DNA."

Ferragut further testified that the analysis of both autosomal STR DNA and Y-STR DNA involved the same series of steps and control measures. Ferragut explained that the only difference between the amplification step in autosomal STR DNA and Y-STR DNA analyses

---

[9] Autosomal STR DNA testing is a common and well-established form of DNA testing. See *People v Lee*, 212 Mich App 228, 248; 537 NW2d 233 (1995). Such testing involves testing areas on both the X and the Y chromosomes on the sample. Y-STR DNA testing is a more specific form of DNA testing that involves testing only the Y chromosome. As discussed in more detail below, we hold that the trial court correctly determined that Y-STR DNA testing possesses the same hallmarks of reliability that has led courts to allow the admission of evidence of autosomal DNA testing.

involved the targeting of different areas of DNA through commercially produced kits. Ferragut added that, if a match exists, the analyst generates a statistical calculation by entering the DNA profile information into a computer program to "see how common that profile is in the general population." Ferragut explained that, in the event of a Y-STR DNA match, "it can be searched in a database, and depending on the number of matches that were obtained in the database, you can then use a statistical calculation to determine how common it is or you would expect it to be in the population of unrelated males." Ferragut further explained that if an analyst identified a Y-STR DNA match in "all the locations on the evidence" with "all the locations identified in a known suspect's sample," the Y-STR DNA could have come from the known suspect or someone else in his paternal line; additionally there was "a possibility that it could randomly match in the population." Finally, Ferragut stated that, after DNA testing occurs, "a technical review is performed on the case to make sure that it is scientifically accurate."

Vitta testified that in 1997 she began working at the Michigan State Police "Northville Biology and DNA unit" identifying bodily fluids and performing autosomal STR DNA and Y-STR DNA analysis. In 2005, she had become the supervisor of the Northville laboratory, and in that position she "supervise[d] the other . . . forensic scientists . . . concerning case work analysis on forensic evidence samples as well as reference samples" and did her own testing of autosomal STR DNA and Y-STR DNA. Vitta also recounted her extensive academic and professional credentials.

Vitta testified that the Northville laboratory currently had multiple national and international accreditations, for which independent auditors frequently examined "every aspect of the laboratory," including "cases and reports, . . . and the data that was generated for the cases." The Northville laboratory also used controls at each step of its DNA testing process. Vitta estimated that she had performed thousands of DNA tests and testified as an expert on the subject many times, but that this was her first case testifying as an expert in Y-STR DNA testing. The trial court certified Vitta as an expert in DNA analysis, including Y-STR analysis.

Vitta testified that autosomal STR DNA testing involved both the X and the Y chromosomes, while Y-STR DNA testing involved sex chromosomes present only on the Y chromosome. Vitta verified that the Northville laboratory adhered to national guidelines in performing DNA analysis. She summarized the very similar steps involved in both autosomal STR and Y-STR DNA testing. Vitta acknowledged that an autosomal STR DNA match could specifically identify one person, but that a Y-STR DNA match did not allow for the exclusion of a random match. Vitta offered an example of when Y-STR DNA testing would prove beneficial, stating, "[I]f you have a sample that . . . has a lot of female DNA in it, and only a tiny amount of male DNA, . . . it ignores completely that non-male DNA portion of that sample, and can pinpoint . . . just the male contribution to the sample."

Vitta testified that the statistical calculation regarding the Y-STR DNA match (haplotype) differed from the calculation performed on an autosomal STR DNA match. The Michigan State Police utilized a database called "the USYSTR data base," which at the time of Vitta's testimony in September 2012 consisted of "approximately 23,000 male samples"

contributed by academic institutions, law enforcement, and other groups across the United States.[10] When Vitta performed Y-STR DNA analysis in this case, the USYSTR database contained more than 18,000 sample haplotypes. Concerning haplotypes from Midwest males, Vitta recounted that organizations in Illinois, Minnesota, and Wisconsin had submitted samples, and because Michigan submitted samples to the FBI, which contributed samples to the USYSTR database, the database might contain some Michigan samples. When making calculations of haplotype frequency, Vitta testified that a "scientific working group on DNA analys[i]s methods" recommended that scientists employ a particular calculation in using the USYSTR database and apply "a 95 percent confidence limit . . . to any calculation . . . conducted using the USYSTR" database.[11]

In this case, Vitta conducted Y-STR DNA testing on "a reference sample from [defendant]," on DNA extracts from a blue scarf "that the victim . . . was bound with when found on November 20, 2012," and on fingernail clippings of the victim's right hand. Vitta testified that she identified DNA types or haplotypes at multiple locations from the blue scarf sample, the right-hand nail clippings, and defendant's known sample. She noticed the same "major male [haplotype] . . . developed from both" the blue scarf and nail clipping samples. With respect to the blue scarf, Vitta undertook "a side-by side comparison . . . [of] the same areas of the . . . Y . . . chromosome that were amplified" in the known sample from defendant, compared "the [haplo]types . . . obtained at each one of those locations," noticed in the blue scarf sample "results . . . consistent with three or more male donors," and opined that the major male donor haplotype in the blue scarf "matched the reference sample haplotype from [defendant]." Vitta also discovered that the major male donor of the DNA under the victim's fingernails matched "the major male Y-STR haplotype" from defendant's known sample.

Vitta testified that because the areas of the Y chromosome examined in Y-STR DNA testing "are inherited in a package . . . from generation to generation down the male line," the significance of Y-STR haplotype matches signified that an individual is not excluded as a source of the DNA, although anyone "in that same paternal lineage," or, less likely, an unrelated male, could also share the same haplotype. When Vitta entered into the USYSTR database the major male haplotype she identified on the scarf that bound the victim, she received the following information: applying "a 95 percent confidence interval, the major Y-STR haplotype . . . detected from the blue scarf would be expected to be observed in 1,923 Caucasian males, 1,558 African-American males, and 1,005 Hispanic males." When Vitta entered into the USYSTR database the major male haplotype she identified under the victim's fingernails, it apprised her that taking into account the 95 percent confidence interval, the likelihood of

---

[10] Vitta explained that before the USYSTR database was used in case work, population geneticists examined it to ensure "that it meets the criteria for use for calculating these frequency estimates." Vitta added that "different peer review articles" concerning the USYSTR database reflected its "acceptance in the scientific community."

[11] According to Vitta, the confidence interval signified "how accurate the calculation, the ultimate frequency estimate is."

observing the haplotype in the population of "Caucasian males was one in 2,342; African-American males one in 2,105; and Hispanic males one in 1,145."

The trial court ruled the offered Y-STR DNA evidence admissible, specifically holding that the prosecution had met the burden of showing that Ferragut's and Vitta's testimony was rooted in "recognized scientific, technical, or other specialized knowledge" which will assist the trier of fact. *Gilbert*, 470 Mich at 789. The trial court also found that defendant's issue with the statistical analysis procedures and database used in Y-STR analysis would go to the weight of the evidence, not its admissibility. See *People v Holtzer*, 255 Mich App 478, 491; 660 NW2d 405 (2003). Finally, the trial court found that the evidence's probative value was not outweighed by the danger of unfair prejudice. MRE 403.

We conclude that the prosecution carried its burden of demonstrating admissibility under MRE 702. Abundant evidence illustrated that the Y-STR DNA analysis technique "has been or can be tested," *Kowalski*, 492 Mich at 131, and that standards exist to govern the performance of the technique. *Daubert*, 509 US at 594. The testimony of Ferragut and Vitta revealed that autosomal STR DNA analysis, the more common and well-established technique, and Y-STR DNA analysis, which came into being more recently, share a nearly identical series of requisite steps in the laboratory. Ferragut and Vitta testified that national guidelines delineate laboratory procedures for properly analyzing Y-STR DNA, multiple controls exist at each step of the Y-STR DNA analysis, the laboratories at which they worked subject the Y-STR DNA analysis to review, and accreditation organizations mandate routine proficiency testing of analysts who performed Y-STR DNA analysis. Guidelines also exist for the commercial kits that targeted DNA on the Y chromosome in Y-STR DNA analysis. Further, both Ferragut and Vitta testified that many publications and peer reviews have scrutinized the soundness of the Y-STR DNA testing technique, as well as the statistical analysis methods and database used by analysts. We conclude the evidence was properly admitted under MRE 702. [12] *Id.*

Further, Ferragut and Vitta repeatedly and plainly explained at the *Daubert* hearing the limited significance of a Y-STR DNA match, specifically that a match could not uniquely identify a male DNA donor and could only include a male as a potential DNA donor. At trial, Altesleben, Vitta, and a defense expert presented these limitations to the jury. We detect no danger of confusion or other unfair prejudice that would substantially outweigh the probative value inherent in the Y-STR DNA testing evidence. MRE 403.

---

[12] See, e.g., *State v Maestas*, 299 P 3d 892, 932-934 (Utah, 2013), cert den ___ US ___; 133 S Ct 1634; 185 L Ed 2d 620 (2013); *People v Stevey*, 209 Cal App 4th 1400, 1410-1415; 148 Cal Rptr 3d 1 (2012); *State v Calleia*, 414 NJ Super 125, 147-149; 997 A2d 1051 (NJ App, 2010), rev'd on other grounds 206 NJ 274; 20 A3d 402 (NJ, 2011); *State v Bauder*, 150 Wash App 690, 718; 208 P3d 1242 (Wash App, 2009), rev den 167 Wash 2d 1009 (2009); and *Curtis v State*, 205 SW3d 656, 661 (Tex App, 2006). See also *State v Metcalf*, 2012 Ohio 674 (Ohio App, 2012).

## V. RIGHT TO CONFRONTATION

Defendant next argues that the trial court violated his right to confront witnesses against him, as well as MRE 804(b)(1), by allowing the admission of Altesleben's preliminary examination testimony. Defendant did not object to the admission of this evidence; this issue is therefore unpreserved and reviewed for plain error affecting substantial rights.

We conclude that the trial court did not err in deeming Altesleben unavailable to testify at trial. Further, defendant enjoyed a prior, similar opportunity to cross-examine Altesleben, and thus the trial court violated neither the Confrontation Clause, US Const, Am VI; Const 1963, art 1, § 20, nor MRE 804(b)(1), in allowing the reading of Altesleben's preliminary examination testimony at trial. Defendant also has not established that trial counsel was ineffective for failing to object to the reading of Altesleben's prior testimony.

A trial court may admit "[f]ormer testimony . . . under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). MRE 804, which describes a hearsay exception for various prior statements of unavailable witnesses, provides, in relevant part:

> (a) "Unavailability as a witness" includes situations in which the declarant—
>
> * * *
>
> (4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; . . .
>
> * * *
>
> (b) The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

The prosecution moved to admit at trial Altesleben's preliminary examination testimony based on a doctor's order confining her to "bed rest as a result of complications associated with her pregnancy." The court found that Altesleben was unavailable and admitted her preliminary examination testimony. We find that the trial court did not err in determining that Altesleben was unavailable based on a "then existing physical . . . illness or infirmity." See *Garland*, 286 Mich App at 7 (holding that "[b]ased on the evidence on the record showing that the victim was experiencing a high-risk pregnancy, that she lived in Virginia, and that she was unable to fly or travel to Michigan to testify, the trial court did not clearly err by determining that the victim was unavailable").

Further, "MRE 804(b)(1) by its language permits testimony from 'the same or a different (prior) proceeding' if the party against whom the testimony is offered had the opportunity and motive in the prior proceeding 'to develop the testimony by direct, cross, or redirect examination.'" *People v Morris*, 139 Mich App 550, 555; 362 NW2d 830 (1984). In this case, defendant had ample opportunity to cross-examine Atlesleben during his and Watson's joint preliminary examination. Atlesleben testified at the preliminary examination on the very charges for which defendant stood trial. Defense counsel for both defendant and Watson cross-examined Atlesleben during the preliminary examination; no indication exists that the district court limited their opportunities to cross-examine Atlesleben, and the trial court admitted both cross-examinations at defendant's jury trial. Consequently, the trial court did not err in admitting the preliminary examination testimony pursuant to MRE 804(b)(1). See *People v Meredith*, 459 Mich 62, 67; 586 NW2d 538 (1998); *Morris*, 139 Mich App at 555. For the same reasons, defendant was not denied his right to confront witnesses against him. See *Crawford v Washington*, 541 US 36, 64; 124 S Ct 1354; 158 L Ed 2d 177 (2004); *California v Green*, 399 US 149, 165; 90 S Ct 1930; 26 L Ed 2d 489 (1970).

Because we find no error in the trial court's admission of this evidence, we also find no merit to defendant's alternative argument that his trial counsel was ineffective in failing to raise a groundless objection to the reading of Atlesleben's preliminary examination testimony. *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).

## VI. ACCOMPLICE JURY INSTRUCTION

Next, defendant argues that the trial court improperly bolstered Watson's credibility with an improper jury instruction. We disagree. In the first instance, defendant waived any claim of error regarding the jury instructions when his counsel affirmatively approved the instructions. *People v Carter*, 462 Mich 206, 208-209, 215; 612 NW2d 144 (2000), reh den 463 Mich 1210 (2000). Further, the jury instructions were not improper.

"A criminal defendant has the right to have a properly instructed jury consider the evidence against him." *People v Rodriguez*, 463 Mich 466, 472; 620 NW2d 13 (2000). This Court reviews jury instructions as a whole to determine whether error requiring reversal occurred. *People v Bartlett*, 231 Mich App 139, 143; 585 NW2d 341 (1998). The jury instructions must include all elements of the charged offenses, and must not omit material issues, defenses or theories that the evidence supports. *Id*. Even when somewhat imperfect, jury instructions do not qualify as erroneous provided that they fairly present to the jury the issues to be tried and sufficiently protect the defendant's rights. *People v Knapp*, 244 Mich App 361, 376; 624 NW2d 227 (2001); *Bartlett*, 231 Mich App at 143.

Watson testified that on November 20, 2011, she and defendant returned to Dailey's house after defendant had proposed robbing Dailey; she and defendant entered Dailey's house; they both participated in taking Dailey's personal property from different areas of the house; and in Watson's presence, defendant repeatedly punched Dailey's face and stomped on her neck, twisted Dailey's neck with his hands, bound her hands with a scarf, and exhibited to Watson a knife before returning to Dailey's bedroom. Watson also testified that in December 2012, the prosecution agreed to dismiss a felony-murder charge against her if she pled guilty to second-degree murder, larceny in a building, and unlawful possession of a financial transaction device.

Watson affirmed that if she "fulfill[ed] certain conditions, . . . [she would] serve a minimum of twenty-three years[.]"

The trial court gave an instruction that closely mirrored standard accomplice instructions CJI2d 5.4[13] and CJI2d 5.6.[14]  Defendant nonetheless complains that the instruction as given

---

[13] The text of CJI2d 5.4 provides:

> (1)  *[Name witness]* says [he/she] took part in the crime that the defendant is charged with committing.
>
> *[Choose as many of the following as apply:]*
>
> [(a)  (*Name witness*) has already been convicted of charges arising out of the commission of that crime.]
>
> [(b)  The evidence clearly shows that (*name witness*) is guilty of the same crime the defendant is charged with.]
>
> [(c)  (*Name witness*) has been promised that (he/she) will not be prosecuted for the crime the defendant is charged with committing based upon any information derived directly or indirectly from the witness's truthful testimony.  The witness may be prosecuted if the prosecution obtains additional, independent evidence against the witness.]
>
> [(d)  (*Name witness*) has been promised that (he/she) will not be prosecuted for the crime the defendant is charged with committing.]
>
> (2)  Such a witness is called an accomplice.

[14] The text of CJI2d 5.6 provides:

> (1)  You should examine an accomplice's testimony closely and be very careful about accepting it.
>
> (2)  You may think about whether the accomplice's testimony is supported by other evidence, because then it may be more reliable.  However, there is nothing wrong with the prosecutor's using an accomplice as a witness.  You may convict the defendant based only on an accomplice's testimony if you believe the testimony and it proves the defendant's guilt beyond a reasonable doubt.
>
> (3)  When you decide whether you believe an accomplice, consider the following:

contained language regarding Watson's plea agreement premised on her truthful testimony (which language also appears in CJI2d 5.4), improperly bolstering Watson's credibility.

However, the instruction did not state or suggest that Watson had offered truthful testimony, but only that the prosecution had agreed to impose on Watson a lesser charge if she offered truthful testimony, and that the prosecution remained free to alter the plea agreement if it obtained additional evidence against Watson. Furthermore, the entirety of CJI2d 5.4 and CJI2d 5.6 plainly cautioned the jury about accepting Watson's testimony for multiple reasons. Moreover, the trial court informed the jury on three occasions that it had the sole responsibility to assess credibility. In light of Watson's testimony establishing her long-time use of cocaine and heroin and her offering of a statement to the police, the trial court additionally gave an addict-informer instruction, CJI2d 5.7, which provided additional cautions to the jury regarding judging Watson's credibility.[15] Finally, the trial court instructed the jury that it should consider

> (a) Was the accomplice's testimony falsely slanted to make the defendant seem guilty because of the accomplice's own interests, biases, or for some other reason?

> (b) Has the accomplice been offered a reward or been promised anything that might lead [him/her] to give false testimony? [*State what the evidence has shown. Enumerate or define reward.*]

> (c) Has the accomplice been promised that [he/she] will not be prosecuted, or promised a lighter sentence or allowed to plead guilty to a less serious charge? If so, could this have influenced [his/her] testimony?

> [(d) Does the accomplice have a criminal record?]

> (4) In general, you should consider an accomplice's testimony more cautiously than you would that of an ordinary witness. You should be sure you have examined it closely before you base a conviction on it.

[15] The trial court instructed the jury as follows with respect to Watson's status as an addict informer:

> You have heard the testimony of Tonia Watson, who has given information to the police in this case. The evidence shows that she is addicted to . . . drugs, namely heroin and cocaine.

> *You should examine the testimony of an addicted informer closely and be very careful about accepting it.* You should think about whether the testimony is supported by other evidence because then it may be more reliable.

> However, there's nothing wrong with the prosecutor using an addicted informer as a witness. You may convict the defendant based on such a witness' testimony alone if you believe the testimony and it proves the defendant's guilt beyond a reasonable doubt.

her agreement to testify in exchange for the prosecution's dismissal of a charge involving "a possible penalty of life without parole" "as it relates to [her] credibility and as it may tend to show . . . [her] bias or self-interest."

We find no error in the trial court's use of an instruction modeled on CJI2d 5.4. *People v Jensen*, 162 Mich App 171, 187-188; 412 NW2d 681 (1987) (explaining that in light of a witness's "admissions and his guilty plea to a reduced charge arising from the incident, his status as an accomplice was beyond dispute," and that the court should have instructed the jury pursuant to CJI2d 5.4). And because the trial court correctly and accurately conveyed to the jury the contents of CJI2d 5.4 and CJI2d 5.6, defense counsel need not have objected to the proper jury instructions. *Thomas*, 260 Mich App at 457.

## VII. LAY OPINION TESTIMONY

In his Standard 4[16] brief, defendant argues that Detective Edgell of the Royal Oak Police improperly opined at trial that a knife in evidence constituted the same one that defendant had used to kill Dailey and discarded onto the Woodward Avenue median. We disagree. Defendant objected to the foundation for Edgell's description of the knife, but did not object to Edgell's description as improper lay opinion testimony; this issue is therefore unpreserved and reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 762-763, 774.

Edgell testified that he participated in the investigation of Dailey's death and was familiar with the location where the police recovered a knife "in the median of Woodward [Avenue]." After the prosecution asked Detective Edgell to point on a map to the precise location where the police discovered the knife, the following colloquy occurred:

> *Det. Edgell*: Yes. The knife that was used to kill Nancy Dailey was found—

---

*When you decide whether to believe Tonia Watson consider the following. Did the fact that this witness is addicted to drugs affect her memory of events or ability to testify accurately[?] Does the witness' addiction give her some special reason to testify falsely[?] Does the witness expect a reward or some special treatment or has she been offered a reward or been promised anything that might lead to her giving false testimony[?] Has the witness been promised that she will not be prosecuted for any charge or promised a lighter sentence or allowed to plead guilty to a less serious charge[?] If so, could this have influenced her testimony[?] Does the witness have a past criminal record[?]*

*In general, you should consider an addicted informer's testimony more cautiously than you would that of an ordinary witness. You should be sure you have examined it closely before you base a conviction on it.*

[16] A defendant may file a pro se brief pursuant to Administrative Order No. 2004-6, Standard 4.

*[Defense counsel]*: Objection, your Honor to the statement that the knife was used to kill Nancy Dailey. I move to strike. There's absolutely no evidence—

*The Court*: I'll strike it.

*[Prosecutor]*: That's fine.

*[Defense counsel]*: Thank you.

At the conclusion of Edgell's testimony, defense counsel requested a mistrial, arguing that Edgell's reference to the knife as the murder weapon prejudiced defendant's right to a fair trial because "[t]hat determination . . . is purely within the providence [sic] of the jury," and "there was no reason for him to volunteer that type of information before this jury." The trial court denied the mistrial motion, reasoning that it "struck the statement from the record and if the defense wants a special instruction now or later on you can have one." The record does not indicate that defense counsel ultimately requested a special jury instruction.

Subsequent to Edgell's stricken testimony, several officers, Watson, and Paruch all testified to the effect that the knife recovered from the median was the same knife that was: (1) stolen from the Paruch household; (2) shown to Watson by defendant before he returned to Dailey's bedroom; (3) indicated by defendant to Watson that he used to cut and stab Dailey's throat and thereafter "stomped . . . in[to] the median over there by Woodward" by the Seville Motel; and (4) recovered partially stuck in the ground at that location. Thus, even assuming that Edgell's statement was erroneous, defendant cannot demonstrate, in light of other properly admitted evidence, that his substantial rights were affected by this isolated (and stricken) statement. We find no plain error requiring reversal in the trial court's refusal to grant a mistrial based on Edgell's stricken statement. *Carines*, 460 Mich at 762-763, 774.

## VIII. EXCULPATORY EVIDENCE

Next, defendant argues in his Standard 4 brief that the prosecution suppressed exculpatory evidence in the form of DNA tests, conducted seven months after the offense was committed, on Jonathan Baker and DeJuan Crawford. We disagree. This issue was not raised at trial and is therefore unpreserved. *Carines*, 460 Mich at 762-763, 774.

"Due process requires the prosecution to disclose evidence in its possession that is exculpatory and material, regardless of whether the defendant requests the disclosure." *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007), lv den 480 Mich 1043 (2008), citing *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). To establish a *Brady* violation, a defendant must prove

> (1) that the state possessed evidence favorable to the defendant; (2) that the defendant did not possess the evidence nor could the defendant have obtained it with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. [*Id*. at 177 (internal quotation and citation omitted).]

-21-

Defendant attaches as exhibit 1 to his Standard 4 brief a June 2012 "DNA Extraction Worksheet," which lists many items that Altesleben extracted in this case, including a "[k]nown buccal [swab] from DeJuan Crawford" and "[k]nown blood from Jonathan Baker." But defendant identifies no evidence tending to establish that this evidence was favorable to him, that he could not have possessed it with reasonable diligence, that the prosecution suppressed it, or that a reasonable probability existed that the disclosure of the evidence might have altered the outcome of his trial. *Schumacher*, 276 Mich App at 176. In short, defendant has failed utterly to support his claim that the prosecution suppressed exculpatory evidence.

## IX. CHAIN OF CUSTODY/EVIDENCE CONTAMINATION/MISHANDLING OF EVIDENCE

Next, defendant argues in his Standard 4 brief that key DNA evidence was mishandled. We disagree. Defendant did not object at trial to the admissibility of the evidence delivered to the police forensic laboratory for testing on the basis that the police failed to maintain the chain of custody or otherwise exposed the evidence to degradation or tampering, or on the basis that Altesleben improperly processed or tested evidence. Consequently, this issue is unpreserved and reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 762-763, 774. We disagree that error requiring reversal occurred.

First, defendant argues that the record reflects that Detective Barretto removed these items from police storage around noon on November 25, 2011, but that the forensic laboratory inexplicably did not receive the items until late on November 28, 2011. In the intervening time, the evidence was locked in Barretto's office, which defendant argues allowed for potential contamination or tampering with evidence.

At trial, defense counsel questioned Barretto regarding his handling of evidence. Barretto confirmed that on Friday, November 25, 2011, the day after Thanksgiving, he had processed all the evidence tested by the Sterling Heights State Police Forensic Laboratory, including the clippings from Dailey's fingernails, the hair removed from Dailey's head, the hairs found on Dailey's body, Dailey's clothes, and the blue scarf used to bind Dailey's arms. Barretto insisted that he had complied with departmental policies by advising the property officer, on November 25, 2011, "which pieces of evidence [he] needed to take to the lab." Barretto acknowledged that he delivered the evidence to the laboratory at 10:40 a.m. on November 28, 2011. However, Detective Barretto repeatedly testified that he had secured the evidence in his office, and further explained as follows about the reason for the delayed delivery:

> As I previously stated, sir, it was locked and secured in my office. The lab was closed on that day being a holiday week and weekend. The lab was closed that Friday afternoon, actually the entire Friday. I wanted to take it basically as quick [as] I can Monday morning to the lab. That's why I already had the property signed out and ready to go, as I stated secured in my office.

> * * *

> It remained in that same condition in my office when . . . I took it to the lab on Monday morning.

-22-

Barretto in later testimony reiterated that the evidence he delivered to the laboratory was in the same condition as when it was recovered from Dr. Pacris, the forensic pathologist who performed Dailey's autopsy.

In summary, the record belies defendant's suggestion that Detective Barretto subjected the evidence to contamination or tampering. Defendant has failed to offer on appeal anything beyond mere speculation that tagged, logged in, and secured evidence locked in a police detective's office was vulnerable to tampering or contamination, and thus fails substantiate any error, plain or otherwise, concerning Detective Barretto's transfer of evidence to the police forensic laboratory.

Defendant attached as exhibits 8 through 18 to his Standard 4 brief printouts of log entries that the Michigan State Police crime laboratories maintained concerning the forensic testing of evidence in this case. According to defendant, the log entries "show that Ms. Altesleben continuously failed to log evidence out properly, anywhere from 6 hours to 6 days, therefore making this documentary evidence invalid." We disagree. Contrary to defendant's contention, the exhibits contain Altesleben's log entries concerning the items she examined. And defendant presents no factual basis suggesting that Altesleben improperly processed or stored the evidence, or that her manner of processing the evidence might have contaminated it. Defendant thus has failed to substantiate any error, plain or otherwise, concerning Altesleben's evidence processing.

Because defendant has not established any factual support for his arguments concerning the mishandling of evidence, he has not established a factual predicate for his alternate claim that his counsel was ineffective for failing to object to its admission on this ground. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

## X. ADMISSION OF WATSON'S STATEMENT TO ROYAL OAK POLICE

Finally, defendant argues in his Standard 4 brief that the admission of Watson's statement to Royal Oak Police violated his constitutional rights, or alternatively that his counsel was ineffective for failing to object to its admission. We disagree. Defendant's argument is partially premised on his claim that the police violated Watson's right to protection from unreasonable search and seizure in obtaining her statement; however, defendant has no standing to challenge a violation of Watson's Fourth Amendment rights. *People v Gadomski*, 274 Mich App 174, 178; 731 NW2d 466 (2007). Similarly, his trial counsel was not required to lodge a meritless objection on this ground. *Thomas*, 260 Mich App at 457.

Defendant also argues that his trial counsel should have obtained "medical records from the Royal Oak Police Department for the treatment of Ms. Watson's withdraws [sic]." However, any such records would only be relevant to the voluntariness of Watson's statements to the police, which defendant lacks the standing to challenge. *In re Investigative Subpoena re Homicide of Morton*, 258 Mich App 507, 509; 671 NW2d 570 (2003). Further, defense counsel questioned Watson at length about her use of illegal and prescription drugs, including around the time of her statements; we thus find no error requiring reversal in counsel's failure to obtain these records. *Marshall*, 298 Mich App at 612.

Because we conclude that defendant has not demonstrated actual errors resulting in unfair prejudice, defendant's claim that the cumulative effect of several errors warrants reversal must also fail. *LeBlanc*, 465 Mich at 591, 592 n 12; *Carines*, 460 Mich at 762-763, 774.

Affirmed.

/s/ Mark T. Boonstra
/s/ Jane E. Markey
/s/ Kirsten Frank Kelly