# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
December 22, 2015

v

CHRISTOPHER RISHARD HENDERSON,

        Defendant-Appellant.

No. 312210
Wayne Circuit Court
LC No. 11-012363-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JAMES TERRELL SHEPERD,

        Defendant-Appellant.

No. 312795
Wayne Circuit Court
LC No. 11-012363-FC

---

Before: SAAD, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

At approximately 9:15 p.m. on November 9, 2010, Paula Illes found Jesus "Jesse" Cabrera dead inside her apartment in the Walnut Creek Apartments in Flat Rock, Michigan. Cabrera had been shot. Defendants Christopher Rishard Henderson and James Terrell Sheperd were both charged with the murder, tried jointly before separate juries, were convicted, and now appeal.

In Docket No. 312210, a jury convicted Henderson of alternative counts of first-degree felony-murder, MCL 750.316(1)(b), and first-degree premeditated murder, MCL 750.316(1)(a). The trial court sentenced Henderson to a single term of life imprisonment without parole for one conviction of first-degree murder, supported by independent theories of premeditated murder and felony murder. We affirm his conviction.

In Docket No. 312795, a jury convicted Sheperd of second-degree murder, MCL 750.317, and first-degree premeditated murder, MCL 750.316(1)(a). The trial court vacated the

-1-

second-degree murder conviction and sentenced Sheperd to life imprisonment without parole for the felony-murder conviction. We vacate his conviction because there was insufficient evidence to support it. See *People v Mitchell*, 301 Mich App 282, 294; 835 NW2d 615 (2013).

## I. HENDERSON

## A. SUFFICIENCY OF THE EVIDENCE

Henderson first argues that there was insufficient evidence to support his conviction of first-degree murder. Challenges to the sufficiency of the evidence are reviewed de novo. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). Due process requires, that when the evidence is viewed in the light most favorable to the prosecution, a reasonable trier of fact could find each element of the crime was established beyond a reasonable doubt. *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002). It is the trier of fact's role to judge credibility and weigh the evidence. *People v Jackson*, 292 Mich App 583, 587; 808 NW2d 541 (2011).

For several months, Henderson lived with Illes and their children in Illes's Walnut Creek apartment. Approximately two weeks before the murder, they split up and Henderson moved out of the apartment complex.

Illes testified that when Henderson moved out he returned his key to her, but the prosecution theorized that he had made a copy of it before doing so. Illes testified that while they lived together, the victim was Henderson's marijuana dealer and that on several occasions he had come to the apartment to sell marijuana to Henderson.

Two witnesses testified that on separate occasions in the months leading to the murder that they heard Henderson talking about robbing and murdering his marijuana dealer. Illes testified approximately two months prior to the murder she overheard Henderson tell Sheperd that he planned to rob his marijuana dealer. She also heard him say that it would be necessary to kill the dealer during the robbery in order to avoid the dealer taking revenge. A second witness, Byron Mitchell, who lived with his girlfriend Lakeisha Andrews next door to Illes, testified that one month before the killing, Henderson approached him and asked if he would assist in a plan to rob and murder the victim.

A third witness, Shavona Hill, testified that on the day of the murder, Henderson sent her a text stating that he was going to "hit a lick," a slang term meaning to commit a robbery.

Lakeisha Andrews, Illes's next door neighbor testified that she returned home between 7 and 8 p.m. and that when she arrived in her apartment, several people were present, including her brother, her friend Jabrell "Blue" Searcy, her boyfriend Mitchell and their two children, and Sheperd's three or four year old daughter.[1] She testified that shortly after her arrival she looked out the window and saw a Hispanic man get out of a blue Explorer and enter the building.

---

[1] Illes testified she was babysitting Sheperd's daughter.

Searcy and Mitchell knew both defendants. Searcy testified that shortly before 9:00 p.m. he was looking out a window and saw Henderson walk up to the entry of the building with a second man. He testified that the second man was *not* Sheperd. Illes testified that when she returned to the building, but before she entered her apartment, Searcy told her that he had seen Henderson enter the building.

Hill gave additional testimony describing Henderson's actions after the murder. He testified that Henderson came to his house late that night with a black duffel bag, told him that he was leaving town, and asked him to get the number for the Greyhound bus station. Shortly thereafter a female friend arrived and drove Hill and Henderson to Toledo, Ohio, where Henderson got out. Illes also testified that in later phone calls, Henderson told her that his life was over and that he would be going to prison. Henderson was later apprehended in Tennessee.

In sum, the evidence against Henderson included proofs that he discussed robbing and murdering the victim on two separate occasions, was seen entering the situs of the murder before it occurred, and that, almost immediately thereafter, he undertook efforts to flee the state.

Given the strength of the evidence against him, Henderson's sufficiency argument is limited to the claim that the conviction of felony murder was improper because there was inadequate proof that the shooting occurred in the course of another felony. However, there was evidence that, before the murder, the victim carried his cell phone and his wallet on his person, had $3,000 in cash, and had a quarter pound of marijuana that was worth $1,200. The next day, after the shooting, none of these items were found in the victim's possession. Viewed in the light most favorable to the prosecution, *Lundy*, 467 Mich at 257, this evidence was sufficient to enable a jury to find beyond a reasonable doubt that Henderson followed through with his plan to rob the victim, his marijuana dealer, and that in addition to shooting the victim he also took the victim's cell phone, money, and marijuana during the offense. Accordingly, the evidence was sufficient to prove the elements of felony murder beyond a reasonable doubt.

## B. MOTION FOR A MISTRIAL

Henderson next argues that the trial court erred in denying his motion for a mistrial. During closing argument, the prosecutor discussed the cell phone and text message evidence admitted in the case. Although evidence of Sheperd's phone number had been presented to the jury through Lakeisha Andrews, the prosecutor told the Henderson jury that, in his testimony, Sheperd had agreed it was his phone number. Counsel for Henderson immediately objected because the Henderson jury was not present for Sheperd's testimony. Counsel argued that the prosecutor's misstatement was deliberate and prejudicial, and that it required a mistrial. The prosecutor acknowledged that she had made an error, but asserted that it was unintentional. The trial court agreed, finding that the prosecutor's misstatement was inadvertent. It also concluded that any prejudice caused by the remark could be cured by instructing the jury to disregard the prosecutor's statement, by requiring the prosecutor to begin her closing argument anew, and by

reminding the jury that the attorneys' statements and arguments are not evidence. Accordingly, the trial court denied Henderson's motion for a mistrial.[2]

"A mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992). An irregularity must have occurred that is so prejudicial to the defendant's rights that it impairs his ability to get a fair trial. *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995). To warrant reversal, the trial court's denial of the request for a mistrial "must have been so gross as to have deprived the defendant of a fair trial and to have resulted in a miscarriage of justice." *People v Vettese*, 195 Mich App 235, 246; 489 NW2d 514 (1992).

As the prosecutor acknowledged below, she improperly argued facts not in evidence when she referred to Sheperd's testimony in her closing argument to the Henderson jury. However, the prosecutor asserted, and the trial court found, that the prosecutor's misstatement was inadvertent. We agree. This trial lasted for 13 days over a four-week period and, because of the use of separate juries, some testimony was presented to one jury, but not the other. Moreover, testimony confirming Sheperd's phone number was presented to the Henderson jury, albeit through a witness other than Sheperd, and the prosecutor made no other reference to Sheperd's testimony. These circumstances support the trial court's finding that the prosecutor's misstatement was inadvertent.

Moreover, we are satisfied that the trial court did not abuse its discretion in determining that a mistrial was not warranted. As indicated, evidence of Sheperd's phone number had been presented through another witness, and thus was already properly before the Henderson jury. In addition, this particular fact was of very minor significance in regards to the proofs against Henderson. Finally, the trial court instructed the jury to disregard the prosecutor's isolated reference to Sheperd's testimony and reminded the jury that the attorneys' statements and arguments are not evidence. Accordingly, the prosecutor's misstatement did not impair Henderson's right to a fair trial. See *People v Alter*, 255 Mich App 194, 205-206; 659 NW2d 667 (2003).

## C. CLAIM OF INSTRUCTIONAL ERROR

Henderson next argues that the trial court erred when it instructed the jury to resume deliberations and attempt to reach a verdict on all counts after the jury had informed the court that it had reached a verdict on count II (premeditated murder) but had not voted on count I (felony murder). Initially, we conclude that this issue is waived. An unequivocal approval of a trial court's course of action constitutes a waiver. *People v Kowalski*, 489 Mich 488, 505; 803

---

[2] "We review for an abuse of discretion a trial court's decision regarding a motion for a mistrial." *People v Wood*, 307 Mich App 485, 504; ___ NW2d ___ (2014). When a defendant alleges that intentional prosecutorial misconduct precipitated a mistrial, the trial court's factual findings are reviewed for clear error. *People v Tracey*, 221 Mich App 321, 323; 561 NW2d 133 (1997).

NW2d 200 (2011).  A waiver extinguishes any error, leaving nothing to review.  *People v Vaughn*, 491 Mich 642, 663; 821 NW2d 288 (2012).  The record shows that the trial court gave its instruction after meeting with the parties.  It advised the jury, "The lawyers have consulted with the Court at side bar, . . . they asked me to instruct you to return to the jury room and attempt to reach a verdict on all counts; okay?"  The court thereafter asked defense counsel, "Is that correct," and counsel responded, "Yes, your Honor."  By affirmatively approving the course of action that the trial court took, defense counsel waived any error.

Even if this issue had not been waived, it would not provide grounds for relief.[3]  MCR 2.513(N)(1)[4] provides that "[a]fter jury deliberations begin, the court may give additional instructions that are appropriate."  MCR 6.420(D) provides:

> Before the jury is discharged, the court on its own initiative may, or on the motion of a party must, have each juror polled in open court as to whether the verdict announced is that juror's verdict.  *If polling discloses the jurors are not in agreement, the court may (1) discontinue the poll and order the jury to retire for further deliberations,* or (2) either (a) with the defendant's consent, or (b) after determining that the jury is deadlocked or that some other manifest necessity exists, declare a mistrial and discharge the jury.  [Emphasis added.]

Thus, under MCR 6.420(D), upon learning that the jury had not reached a verdict for count I, it was appropriate for the trial court to order continued deliberations.

The record does not support Henderson's argument that the jury had concluded that he should not be convicted of *premediated* murder, and, therefore, "moved directly to felony murder."  First, it was the felony-murder charge (count I), not the premeditated murder charge (count II), that the jury initially did not consider.  Second, when initially asked about count I, the jury foreperson stated, "We did not vote on that."  There was no suggestion that the jury concluded that count I was not an appropriate charge.  On the contrary, the jury later unanimously found Henderson guilty of both first-degree premeditated murder and felony murder.  Accordingly, there was no plain error.

## D.  DUE PROCESS

Finally, Henderson argues that several trial interruptions and delays prejudiced his due process right to receive a fair trial.[5]  As explained in *People v Bosca*, 310 Mich App 1, 73-74; ___ NW2d ___ (2015):

---

[3] Because there was no objection to the court's instruction, appellate review of this issue would be limited to plain error affecting Henderson's substantial rights.  See *Vaughn*, 491 Mich at 663-664.

[4] MCR 6.414, the court rule governing the conduct of criminal jury trials, was repealed effective September 1, 2011.  The staff comment provides that jury practices are governed by MCR 2.513.

Due process claims may be procedural or substantive. Procedural due process involves the fairness of the procedures used by the state that result in the deprivation of life, liberty, or property. With regard to criminal statutes, procedural due process is generally satisfied by providing a defendant with reasonable notice of the charge against him or her and an opportunity to be heard and present a defense. By contrast, the right to substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them. A substantive due process challenge may be facial or as applied. [Citation and quotation marks omitted.]

Henderson argues that his due process rights were violated because the trial, which was originally expected to last 6 or 7 days, extended over a four-week period, with numerous days off, partial days off, and a lapse of an entire week. He argues that the interruptions and delays impaired his ability to receive a fair trial. This claim is in the nature of a procedural due process violation.

The record reveals that most of the delays were caused by circumstances beyond the court's control. The duration of the trial was extended in part because of juror issues. On the fifth day of trial, a Monday, two jurors on Sheperd's jury experienced family issues. One juror's mother was diagnosed with breast cancer and surgery was scheduled for Wednesday of that week. The second juror experienced a death in the family and the funeral was scheduled for Tuesday. Additionally, trial counsel for Henderson was unavailable to try the case on Wednesday, but made arrangements for another attorney to cover trial that day. The attorneys then agreed with the trial court's decision to schedule trial for Monday and Tuesday of that week, and then adjourn until the following Tuesday because of the Memorial Day holiday. In light of defendant Henderson's agreement to adjourn trial for an entire week to address the juror issues, he cannot complain of error. An aggrieved party cannot claim error predicated on conduct to which it contributed by plan or neglect, but rather, waives appellate review of the issue. *People v Gonzalez*, 256 Mich App 212, 224; 663 NW2d 499 (2003).

Moreover, the record does not support Henderson's argument that the interruptions and delays prejudiced his ability to receive a fair trial. Henderson asserts that the duration of the trial made it "impossible for the jurors to remember," and that the jury "lost track of the evidence, could not follow [its] instructions, and the prosecutor forgot which evidence was admitted at which trial." However, he cites no particularized reason for this claim other than the general passage of time. Moreover, the trial court allowed the jurors to take notes, and there is no indication that the jurors asked to review any trial testimony during their deliberations. Although the jury initially failed to render a verdict on both counts, that appears to have been because of a misunderstanding about whether it was required to return a verdict on both counts of first-degree murder. The trial court instructed the jury on how to proceed, and it complied with its supplemental instruction.

[5] Because Henderson did not raise this issue below, it is unpreserved. Unpreserved claims of constitutional error are reviewed for plain error affecting substantial rights. *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009). Henderson bears the burden of demonstrating a plain error. *People v Chelmicki*, 305 Mich App 58, 69; 850 NW2d 612 (2014).

Henderson also asserts that trial was delayed because of the vigorous advocacy by Sheperd's counsel. However, there is no indication that Henderson moved for separate trials to avoid any delays created by trying the case before separate juries. Additionally, there is no indication that Henderson objected to the advocacy and sought some sort of remedy before the trial court.

In sum, the record does not support Henderson's claim of a due process violation. Therefore, Henderson has failed to demonstrate a plain error affecting his substantial rights.

## II. SHEPERD

Sheperd was tried with Henderson but before a different jury and was convicted of first-degree premeditated murder and second-degree murder. He filed a motion for judgment notwithstanding the verdict (JNOV) asserting insufficiency of the evidence and a motion for new trial asserting that the verdict was contrary to the great weight of the evidence.

The Michigan Supreme Court has stated that in reviewing a claim of insufficient evidence, "[t]aking the evidence in the light most favorable to the prosecution, the question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 420-421; 646 NW2d 158, 161 (2002). Where the evidence is insufficient, a defendant's conviction is to be vacated and a judgment of acquittal entered. *Mitchell*, 301 Mich App at 294.

A motion for new trial based on the great weight of the evidence is held to a less exacting standard and offers lesser relief, i.e. a new trial rather than an acquittal. As the Supreme Court stated in *People v Lemmon*, 456 Mich 625, 634-636, 576 NW2d 129, 133-34 (1998):

> Under statute, as well as the court rule, the operative principles regarding new trial motions are that the court "may," in the "interest of justice" or to prevent a "miscarriage of justice," grant the defendant's motion for a new trial. . . . [I]n addition to preventing injustice, a new trial may be granted if the verdict is against the great weight of the evidence. . . . [However,] a judge may not repudiate a jury verdict on the ground that he disbelieves the testimony of witnesses for the prevailing party. [Citations and quotation marks omitted.]

With these standards in mind, we review the evidence against Sheperd.

As an initial matter, there was no forensic evidence indicating that he had been present at the crime scene. Of course, the same is true as to Henderson. However, the case and evidence against the two men differed greatly in almost all other respects.

First, no witnesses placed Sheperd at the scene of the murder, nor anywhere near it. The sole witness who saw Henderson enter the building was Searcy, who testified that he was looking out of the window shortly before the shooting and saw Henderson and a second man come up to the building. Searcy, who personally knew both defendants, testified that the man accompanying Henderson was *not* Sheperd. In response to questioning from Sheperd's attorney, he stated:

Q: You didn't know who the other person [with Henderson] was; is that correct?

A: Yes, sir.

Q: . . .[Y]ou knew my client, Mr. Sheperd previously; is that correct?

A: Yes sir.

Q: . . . And you didn't see Mr. Sheperd that night?

A: No, sir.

Thus, Searcy's testimony was not merely devoid of inculpatory evidence as to Sheperd; it was affirmative evidence that Sheperd was not with Henderson as he entered the building.[6]

Second, multiple witnesses testified that Sheperd was at work in a Ford factory from the middle of the afternoon until approximately 3:00 a.m. on the night of the murder.

Sheperd testified that he was at his grandmother's house that day and that she drove him to Baskin Enterprises, where he applied for a job at about 1:30 p.m. Baskin Enterprises provides contract labor to parts suppliers who need employees to work within Ford plants to conduct the final work on the parts they supply. Sheperd was hired by Baskin and told to begin immediately. His grandmother then drove him to the Ford plant where he was met at the security gate by a van and driven into the plant. He testified that he began work at about 4:30 p.m. and worked cleaning and inspecting parts until approximately 3:00 a.m. when he left work and his grandmother picked him up. His grandmother confirmed all this in her testimony.

Although one could fairly challenge the weight of Sheperd and his grandmother's testimony, the evidence in this case went well beyond their statements. Joe Baskin, the owner of Baskin Enterprises, and Ralph Milhouse, the floor supervisor at the Ford factory on the day in question, both fully confirmed Sheperd's testimony. Baskin testified that Sheperd was interviewed by a member of his staff and was told to report to work immediately. He testified that he personally drove the van that picked Sheperd up at the security gate and took him into the plant. He produced his company's time records confirming that Sheperd was at the plant from the late afternoon until the wee hours of the next morning on the night of the murder. Additionally, Milhouse testified that he saw Sheperd at the plant that night, relieved him for bathroom breaks and for lunch, and showed him the way out of the plant at the end of the shift.

Moreover, both Baskin and Milhouse testified that it would have been impossible for Sheperd to have left during the shift and then returned to work without anyone noticing his absence. They outlined several reasons. First, Sheperd was working on an assembly line where

---

[6] Searcy also testified that the man with Henderson was several inches *shorter* than Henderson. In fact, according to the Offender Tracking Information System (OTIS) and presumably apparent in the courtroom, Sheperd is three inches *taller* than Henderson.

a new part arrived at his work station approximately every minute, requiring him to make a notation in the log for each part. It would have been obvious if the notations were not made. Second, they explained that if Sheperd left the line without wiping the oil from the parts (as he was supposed to do), it would have been noticed by workers further down the line and the line would have been stopped. Third, if Sheperd had somehow left the plant without being noticed, as the prosecution theorized, he would not have been able to later return to finish the shift because one could not get through the security gate without a security pass, which Sheperd did not have. Indeed, none of the Baskin employees were provided with Ford security passes, which is the reason that Baskin would meet his workers at the security gate and drive them in.

Nevertheless, the prosecutor argued repeatedly—without a single witness or document in support—that at some time during the shift, while the assembly line was operating, Sheperd left his work station undetected, walked the mile from his work station to the gate, exited the premises, traveled to Flat Rock (by unknown means), and participated in the murder. The prosecution theorized that Sheperd then returned to the plant, passed through the security gate despite his lack of a pass, walked the mile back to his work area, and returned to his work station without anyone noticing that a position on the assembly line had been unattended for approximately two hours.

It is not our role to reject the credibility findings of the jury. *Jackson*, 292 Mich App at 587. However, even assuming that the jury chose to reject the documentary evidence and testimony from two disinterested witnesses showing that Sheperd was at work, there is still a complete dearth of affirmative evidence, either direct or circumstantial that Sheperd was at the scene of the murder. As noted, the sole eyewitness said that *Henderson* was there, but *Sheperd* was not.

The prosecution's response to this evidence practically reversed the burden of proof. The prosecutor argued that no one had testified that they were watching Sheperd every minute at the plant, that Sheperd had not demonstrated that the prosecution's theory was impossible, and that police investigation had been "unable to confirm" that Sheperd had been at work. The prosecutor's argument that the police "could not confirm" Sheperd's whereabouts clearly invited the jury to switch the burden of proof. Moreover, the record shows that the police attempts to "confirm" the story were minimal at best. The police first attempted to determine if Sheperd was working by mistakenly contacting an uninvolved company. When told by this uninvolved company that they had no record of Sheperd, most police efforts investigating Sheperd's whereabouts ended. Eventually, the police spoke with Baskin representatives who apparently told the officers the facts that were later testified to at trial. The officers, however, did not request Sheperd's time card nor did they subpoena any Baskin personnel to appear for an investigative deposition like several other witnesses had been required to do.

The case against Sheperd rested on three pieces of evidence. First, Illes testified that two months before the murder, she heard Henderson say to Sheperd that he planned to rob and murder his marijuana dealer. Illes testified that Sheperd said, "Yeah" in response. She did not recall him saying anything else in the conversation. Neither she nor anyone else testified that Sheperd was heard making any statement that would show any actual participation by Sheperd in discussing or planning a murder beyond the single word "Yeah." Moreover, Mitchell testified

that one month later, Henderson was asking *him* to help kill the victim, which would be a curious action if he had already obtained Sheperd as his accomplice.

The second piece of evidence brought out in the prosecution's case was the fact on the day of the shooting, Sheperd and Henderson exchanged several text messages and telephone calls, including one message in which defendant Sheperd stated "they sending me to work right now. We got to set it 4 2 nite or n the morning." Sheperd testified that this text concerned a plan to see some girls, and there was testimony from some of the female witnesses that on the same evening they were making arrangements to engage sex for money. But even assuming the jury concluded that this reference concerned a murder plot that Sheperd had been involved in, there was still no evidence that Sheperd actually participated in the robbery or killing.

The third piece of evidence was a police officer's testimony that when asked about Henderson, Sheperd said that he did not know him. Sheperd testified that he told the police that he *did* know Henderson, but that they were not close. The police report of Sheperd's interview that day made no reference to him denying knowing Henderson. Accepting the officer's testimony as true, such evidence would show that Sheperd lied to the police about knowing Henderson, who had been accused of murder. While failing to admit that he knew Henderson could be consistent with guilt, it is by no means affirmative evidence of guilt.

This evidence gives rise to a *suspicion* that defendant was somehow involved in this crime, but it wholly fails as evidence of guilt beyond a reasonable doubt, even when viewed in the light most favorable to the prosecution. Circumstantial evidence must be based on more than mere speculation or conjecture. See *People v Fisher,* 193 Mich App 284, 289; 483 NW2d 452 (1992). As "a society that values the good name and freedom of every individual," we do not condemn men and women for the commission of a crime that has not been proven beyond a reasonable doubt. *In re Winship,* 397 US 358, 363-364; 90 S Ct 1068; 25 L Ed 2d 365 (1970). The purpose of the reasonable-doubt standard is not to make it harder to convict guilty people, but to prevent the conviction of the innocent. See *id.* If we dispense with the reasonable doubt standard because we have reason to suspect that a defendant *may* be guilty, then surely the innocent will be condemned. A conviction of murder or any other crime may not be based on the presence of doubts about the defendant's innocence, but only on the basis of evidence that leaves no reasonable doubt as to his guilt. In this case, the evidence is simply insufficient to sustain Sheperd's conviction.

In addition, even if we could somehow construe this evidence as sufficient, we would have to reverse and remand for a new trial as it is overwhelmingly clear that the great weight of the evidence supported the defense: the sole eyewitness to the crime testified that Sheperd, whom he knew, was not present, and there was testimony from two disinterested witnesses, supported by documentation, that Sheperd was at work at a Ford plant during the entire evening and could not have been present in Flat Rock at 9:00 p.m. when the murder occurred. Moreover, unlike Henderson, Sheperd did not attempt to flee after the murder and he did not make any inculpatory statements.

## III. CONCLUSION

We affirm Henderson's conviction. We vacate Sheperd's conviction because it was not supported by sufficient evidence.

/s/ Henry William Saad
/s/ Michael J. Kelly
/s/ Douglas B. Shapiro