*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANDRE ELBERT WOODS,

        Defendant-Appellant.

UNPUBLISHED
March 19, 2026
2:40 PM

No. 365084
Wayne Circuit Court
LC No. 19-005193-01-FC

Before: RIORDAN, P.J., and GARRETT and MARIANI, JJ.

PER CURIAM.

Defendant appeals by right his bench-trial convictions of first-degree premeditated murder, MCL 750.316(1)(a); assault with intent to murder (AWIM), MCL 750.83; carrying a dangerous weapon with unlawful intent, MCL 750.226; and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to life in prison without the possibility of parole for first-degree murder, 15 to 30 years' imprisonment for AWIM, 3 to 5 years' imprisonment for carrying with unlawful intent, and two years' imprisonment for each count of felony-firearm. The felony-firearm convictions were to be served concurrently to one another but consecutive to their corresponding underlying convictions of first-degree murder and carrying with unlawful intent. We affirm.

## I. BACKGROUND

This case arises from the shooting death of Tremon Weaver in the parking lot of a party store located at the corner of Puritan and Coyle Streets in Detroit on August 26, 2018, at around 3:00 p.m. Multiple eyewitnesses testified about the events in question, and surveillance cameras in the area also captured some of the events that occurred before and after the shooting. Weaver and his two friends, Madison Mathis and Gerrod Lark, drove to the party store. Weaver and Lark went inside the store while Mathis remained in the car. Weaver returned to the car a few minutes later and, moments after he did so, an individual wearing all black clothing—a hooded sweatshirt, sweatpants, a facemask, and gloves—ran to Weaver's side of the car from a black Cadillac parked nearby and then fired several shots from an assault-style rifle at Weaver through the car window. At Weaver's direction, Mathis got out of the car and ran away. Meanwhile, the individual, while

-1-

still shooting toward Weaver's car, ran back toward (but did not get into) the black Cadillac. Mathis suffered a wound to her foot because a bullet struck her as she ran. Weaver sustained multiple gunshot wounds and died from the resulting injuries within a few hours.

Shortly after the shooting, officers canvassed a residential area near the party store in search of the shooter. Based on surveillance footage from the party store and from multiple homes in the area, the investigating officers determined that the shooter fled the party store on foot and then ran through the residential area, discarding the rifle and the hooded sweatshirt in the process. The rifle was never recovered, but a black hooded sweatshirt was found in a garbage can on the shooter's flight path. The surveillance footage from the homes also showed a black Cadillac driving through the neighborhood multiple times in a period of minutes. The prosecution's theory at trial was that an individual in the black Cadillac drove the shooter to the party store and, after the shooter fled from the party store, drove around the neighborhood looking for him.

The lead investigating detective testified that, within a few hours of the shooting, an individual dropped off a note at the police station. That individual refused to be identified. The note's contents caused the detective to look into certain Facebook and Instagram accounts. The detective determined that those accounts, and the phone numbers tied to them, belonged to defendant and Tarlisa Howard, the mother of defendant's two children. At the time of the shooting, however, Howard was romantically involved with Weaver. The social media pages contained photos of defendant with a black Cadillac, as well as photos of defendant wearing pants and a hooded sweatshirt matching what the shooter had been seen wearing in the surveillance footage.

The detective also obtained phone records for defendant and Howard, which showed that they had exchanged messages and were in the area around the time of the shooting. The phone records also showed that defendant had left the area and driven to Kentucky about a day after the shooting. Approximately a month later, while still in Kentucky, defendant asked Ashley Gibson, who lived in the state at that time, to drive him in her car back to Detroit so he could attend a funeral; in exchange, he would give her money to get her car out of an impound lot. Gibson agreed. After they returned to Kentucky, defendant asked Gibson if she would switch her Ford Fusion for his black Cadillac because his Cadillac was "too hot" for him to drive. Gibson agreed to this as well. Defendant was eventually located in Kentucky and extradited back to Michigan to face the charges in this matter.

At trial, the prosecution also introduced the preliminary-examination testimony of Jordan McCormick.[1] McCormick was Weaver's friend and knew Howard as Weaver's girlfriend. McCormick testified that, a few hours before the shooting, he saw a black Cadillac circling around his neighborhood, so he followed it to determine who it was. McCormick could not identify the

---

[1] As discussed more thoroughly below, McCormick had testified at defendant's preliminary examination, but by the time of trial, he was not willing to cooperate with the prosecution and had left the state. The prosecution eventually located McCormick in Georgia and served him with a subpoena, but McCormick failed to appear at trial to testify. Pursuant to the prosecution's request—and over defendant's objection—the trial court deemed McCormick an unavailable witness and allowed the prosecution to introduce his testimony from the preliminary examination.

driver, but he described the driver as a black male wearing a dark hooded sweatshirt. He also identified Howard as the woman in the passenger seat.[2] According to McCormick, Howard appeared angry, and she told him that she was looking for Weaver because Weaver had shot at her during an argument the night prior. McCormick observed a rifle between the driver and Howard and that the driver had his hand on the rifle. The prosecution's theory at trial was that Howard was the individual who had assisted defendant in the shooting by driving the black Cadillac to pick defendant up after he fled the scene.[3]

Defendant want convicted and sentenced as described. This appeal followed.[4]

## II. SEARCH WARRANTS

Defendant argues that the trial court erred by admitting evidence obtained from the searches of his Facebook accounts, Instagram accounts, and phone records. Prior to trial, defendant moved to suppress this evidence, arguing that the search warrants were invalid. The trial court disagreed and denied the motions. Defendant now challenges that conclusion, but we see no reversible error in it.

## A. ADDITIONAL BACKGROUND

Before turning to defendant's challenges, additional background regarding the warrants at issue and the trial court's rulings on defendant's motions to suppress is in order.[5] The affiant for the search warrants was the lead investigating detective in this case, who had then worked in law enforcement for more than 19 years. She stated in the affidavits[6] that she received information from multiple named individuals, including several police officers and Mathis, as well as two anonymous tips from unnamed individuals, and recited the known facts of the shooting. Regarding

---

[2] McCormick did not identify Howard by name but had instead identified her as Weaver's girlfriend when police presented him with a photo line-up.

[3] Howard was charged in separate proceedings as a codefendant with the same charges as defendant for Weaver's shooting. It is unclear from the record before us what the ultimate outcome of those proceedings may have been.

[4] When defendant filed his brief on appeal with this Court, he also filed a motion to remand to the trial court for an evidentiary hearing regarding his ineffective-assistance claims discussed more fully below. This Court denied without prejudice defendant's motion to remand "for failure to persuade the Court of the necessity of remand at th[at] time." *People v Woods*, unpublished order of the Court of Appeals, entered June 10, 2025 (Docket No. 365084). Upon plenary review, we continue to see no need for a remand to properly dispose of the claims at issue.

[5] Defendant filed five separate motions on the basis of the types of evidence he was seeking to suppress, but the substance of the motions was the same.

[6] The information in the affidavits for each of the search warrants pertaining to the Facebook accounts, Instagram accounts, and phone records was verbatim the same, save specific references to the individual social media accounts and phone numbers.

the anonymous tips, the affiant stated that, at around 8:00 p.m. on the evening of the shooting, she had received information that an unknown man "came into the [police department] stating 'these are the people who killed the guy on Puritan and Coyle[,]' put a note on the desk and left the precinct." The note itself "read 'go on Facebook' with names Juss Lashay, Dexter Dre Standalone and vehicle listed as a black Cadillac." The affiant's database search of the provided Facebook profiles revealed that the profile for "Dexter Dre Standalone" belonged to defendant, that the profile for "Juss Lashay" belonged to Howard, and that Howard's profile listed defendant "as her significant other." The affiant further stated that, during her investigation, she determined that Howard was pulled over by officers of the West Bloomfield Police Department on June 28, 2018; Weaver was with Howard at that time, and Howard identified him as her ex-boyfriend.

The affiant further stated that she reviewed the surveillance footage from a police vehicle that had responded to the shooting, which depicted a black Cadillac leaving the area shortly after the shooting, and then visited the residential area near the party store on August 28, 2018, to "review[] video from the residence cameras." In one video, the affiant observed "a Black Cadillac possible CTS with tinted windows pull to the side of the road where victim's vehicle was parked." After the shooting began, "the black Cadillac complete[d] a U turn and fle[d] northbound on Coyle," while the shooter fled on foot "with the weapon east from location through the field." The shooter, who could be seen wearing dark "sweat type pants, and a dark hoodie, armed with what appear[ed] to be an assault rifle," then ran into the backyard of a house on Coyle Street "looking for a way out, jump[ed] the fence[,]" and then "fled towards Robson east bound with the weapon." The affiant stated that, while investigating video footage in the neighborhood, she "received a tip from a person who wants to remain anonymous who stated that the rumor is the shooter ran to Robson Street then started walking north towards Florance [sic] while taking off his mask and hoodie." Based on that tip, the affiant "then followed the path that [the] offender possibly took," and while on Florence Street, she observed a house on Marlowe Street that had surveillance cameras. The affiant then spoke to the homeowners, who allowed her to review their video footage from "a short time after the shooting," which showed "a black male running down the street east down Florance [sic] on the north side wearing a black T shirt, same type pants looking around, walking with a limp, and appear[ing] to be out of breath." The affiant further stated that the video showed the shooter's face and that he "resemble[d] [defendant] who was identified through the tip."

The affidavits for the social media accounts indicated that, based on the information summarized above and the affiant's training and experience, the affiant believed that records from those accounts would assist in "gathering information in relation to the shooting" that showed "any indication of conception, planning, commission and/or cover-up of criminal activity and [would] also provide cellular data connected to the account." And the affidavits related to the phone numbers indicated that, based on the same, the affiant believed that the information and phone data collected from those numbers would assist in gathering evidence demonstrating that defendant "was at the scene at the time of the Homicide" or demonstrating "any indication of conception, planning, commission and/or cover-up of criminal activity." A judge found that the affidavits had provided sufficient evidence to satisfy the probable-cause standard and issued warrants allowing officers to search the social media accounts and phone numbers for—and seize, if found— evidence of defendant's involvement in the shooting, including photos, posts, messages, and location data.

As noted, during pretrial proceedings, defendant moved to suppress the evidence obtained pursuant to the search warrants issued for the Facebook accounts, Instagram accounts, and phone records, arguing, in relevant part, that the judge should not have issued the search warrants because the affiant (1) relied on anonymous information that was not properly investigated and confirmed to support a probable-cause finding, and (2) included in the affidavits "material omissions, distortions and falsifications of the information available" to her at the time that were meant to intentionally mislead the signing judge "into believing there was probable cause" for the searches—namely, that the affiant could positively identify defendant as the suspected shooter in the surveillance footage. The prosecution responded, in relevant part, that (1) there was a substantial basis for a probable-cause finding, and (2) there was nothing indicating that the affiant had materially omitted information from the affidavits or had distorted or falsified information contained in the affidavits.

Following an evidentiary hearing, the trial court issued a comprehensive written opinion and order denying defendant's motions to suppress. The court found that, when reviewing the search warrants and supporting affidavits in a common-sense and realistic manner and affording the signing judge's probable-cause determination great deference, there was a substantial basis for a probable-cause finding for each of the warrants. Specifically, the court found that the affiant, after reviewing the anonymous tips, had conducted an investigation to independently verify the accuracy and reliability of the information received from those tips; this investigation included reviewing the surveillance footage that officers had already obtained, revisiting the suspected flight path of the shooter, speaking to residents on that flight path, reviewing additional surveillance footage from the time of the shooting obtained while revisiting the flight path, and visually confirming with the surveillance footage and photos available on social media that the shooter and the Cadillac seen at the shooting matched the description provided by the anonymous tipsters. The court concluded that the information in the affidavits tied the alleged offenses to defendant, Howard, and defendant's black Cadillac. Relying on much of the same information, the court also found that the affiant had not made material omissions or otherwise altered the information contained in the affidavits to intentionally mislead the signing judge.

## B. STANDARDS OF REVIEW

"We review a trial court's findings of fact associated with a motion to suppress evidence for clear error, but we review de novo both questions of law relevant to the suppression motion and the judge's ultimate decision." *People v Robe*, 337 Mich App 142, 144 n 2; 972 NW2d 52 (2021). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Gingrich*, 307 Mich App 656, 661; 862 NW2d 432 (2014) (quotation marks and citation omitted). The trial court's factual determinations are afforded deference, *id.*, and "[w]e overstep our review function if we substitute our judgment for that of the trial court and make independent findings," *People v Stricklin*, 327 Mich App 592, 598; 935 NW2d 59 (2019) (quotation marks and citation omitted).

## C. PROBABLE CAUSE

Defendant argues that there was insufficient probable cause to support the search warrants because the supporting affidavits were based on anonymous tips and the officers' investigation into these tips did not sufficiently corroborate the tips' substance. We disagree.

A search warrant may only be issued if probable cause exists to justify the search. US Const, Amend IV; Const 1963, art 1, § 11; MCL 780.651(1). Probable cause to issue a search warrant exists if "there is a substantial basis for inferring a fair probability that contraband or evidence of a crime will be found in a particular place." *People v James*, 327 Mich App 79, 90; 932 NW2d 248 (2019) (quotation marks and citation omitted). A probable-cause determination must be based on the facts presented to the judge or magistrate by oath or affirmation. *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009); see also MCL 780.651.

Probable cause may be based on information supplied to the affiant by an unnamed person so long as the affidavit contains sufficient facts " 'from which the judge or district magistrate may conclude that the person spoke with personal knowledge of the information and either that the unnamed person is credible or that the information is reliable.' " *James*, 327 Mich App at 91, quoting MCL 780.653(b). When probable cause is averred in an affidavit, "the affidavit must contain facts within the knowledge of the affiant and not mere conclusions or beliefs." *James*, 327 Mich App at 91 (quotation marks and citation omitted); see also MCL 780.653. Although an affiant "may not draw his or her own inferences" based solely on his or her experience, "the affiant's experience is relevant to the establishment of probable cause." *Waclawski*, 286 Mich App at 698. "A warrant may issue on probable cause if the police have conducted an independent investigation to confirm the accuracy and reliability of the information regardless of the knowledge and reliability of the source." *Id*. at 699 (quotation marks, citation, and alteration omitted).

When there is a challenge to a search warrant, the reviewing court must read the affidavit in support of the warrant "in a common sense and realistic manner, not a crabbed or hypertechnical manner." *People v Mullen*, 282 Mich App 14, 27; 762 NW2d 170 (2008) (quotation marks and citation omitted). Accordingly, this Court looks to whether "a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause to issue a search warrant." *Waclawski*, 286 Mich App at 699. Generally, "if a warrant is determined to be invalid because it lacked a probable-cause basis . . . , any evidence seized pursuant to that warrant . . . is inadmissible as substantive evidence in related criminal proceedings." *People v Hellstrom*, 264 Mich App 187, 193; 690 NW2d 293 (2004). "A magistrate's finding of probable cause and his or her decision to issue a search warrant should be given great deference and only disturbed in limited circumstances." *People v Franklin*, 500 Mich 92, 101; 894 NW2d 561 (2017).

In arguing that the officers' investigation into the anonymous tips was insufficient to verify the reliability and accuracy of those tips, defendant maintains that the police "could provide no evidence that the confidential informant[s] had historically been reliable" because they were not individuals "that the police had worked with in the past." But, as noted, the officers did not need to detail the knowledge or reliability of the anonymous source so long as they "conducted an independent investigation to confirm the accuracy and reliability of the information" provided by that source. *Waclawski*, 286 Mich App at 699. And, as demonstrated by the information contained

in the affidavits at issue, the police in this case had independently confirmed the accuracy and reliability of the information provided by the unnamed individuals through additional investigation into that information. See *id*.

The detective stated in the affidavits that after she had received the first anonymous tip—which was received only two hours after the shooting and had accurately described the location of the shooting—she reviewed the Facebook accounts and police databases and, based on that review, was able to confirm that the Facebook accounts were associated with defendant and Howard. The detective was also able to confirm, based on the information listed on those accounts and contained in the police databases, that defendant and Howard were in a relationship and that Howard and Weaver had previously been in a relationship. The detective also stated in the affidavits that, after she had received the second anonymous tip regarding the shooter's flight path, she personally followed that path, during which time she found and reviewed video surveillance footage of the suspected shooter from the home on Marlowe Street. The affidavits indicated that the detective had used photos—which included defendant's name and had depicted defendant with a black Cadillac—to identify defendant as both the account-holder for the social media pages and the suspected shooter, as he had a similar appearance, outfit, and car to the suspect seen on the surveillance videos. All of this provided more than enough to lead a reasonably cautious person to conclude that there was a substantial basis for finding probable cause to issue the search warrants—that is, for inferring a fair probability that evidence of a crime would be found on the social media accounts and phone numbers as specified. See *James*, 327 Mich App at 90; *Waclawski*, 286 Mich App at 699.

Defendant also argues that the affidavits included false or reckless statements intended to mislead the signing judge. False statements cannot be used as a basis for a probable-cause finding, and a defendant may "challenge the truthfulness of an affidavit's factual statements." *Waclawski*, 286 Mich App at 701. That said, the defendant does so "under a difficult standard," as there is "a presumption of validity with respect to the affidavit supporting the search warrant," and the defendant bears "the burden of showing, by a preponderance of the evidence, that the affiant knowingly and intentionally, or with a reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to the finding of probable cause." *Id*.

Defendant's sole argument in this regard is that the detective, in identifying defendant as the suspected shooter in the surveillance video, made a false or reckless statement included only to mislead the signing judge because the video was "too grainy" and "not clear enough to determine the individual's identity." But the detective did not positively identify defendant as the shooter in the affidavits; rather, she stated only that the individual she observed in the surveillance video "resembled" defendant. In any event, there is no reason to believe that the detective's statement was false or reckless. The detective stated in the affidavits that, prior to reviewing the video footage in question, she had personally observed photos of defendant on Facebook and on a police database while investigating the anonymous tip left at the police station. She was therefore familiar with what defendant looked like at the time that she reviewed the surveillance footage and would have been able to determine, with some modicum of reliability, whether the individual seen in the video resembled defendant. And having reviewed on appeal the video footage in question, it is unclear why defendant believes that it was "too grainy" for the detective to have been able to determine whether the depicted individual resembled defendant. On this record, defendant has not satisfied his burden of showing that the detective "knowingly and intentionally, or with a reckless

disregard for the truth, inserted false material into the affidavit[s]" and has therefore failed to establish any error with regard to the affidavits or search warrants. *Id.*

In sum, we do not see merit in defendant's challenges to the search warrants and find no error in the trial court's subsequent admission of the evidence from the searches at trial.

## III.  UNAVAILABLE WITNESS

Defendant next argues that the trial court erred by admitting McCormick's preliminary-examination testimony at trial under MRE 804(b)(1)[7]—namely, by concluding that McCormick was an unavailable witness and that the prosecution had exercised due diligence in attempting to produce him to testify at trial. Relatedly, defendant argues that the court's erroneous admission of McCormick's testimony violated his confrontation rights.

We review the court's ultimate decision on whether the prosecution exercised due diligence in producing a witness for an abuse of discretion. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). We also review the court's evidentiary rulings for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 251-252; 934 NW2d 693 (2019). An abuse of discretion occurs when the trial court renders a decision that "falls outside the range of reasonable and principled outcomes" or when the court "makes an error of law." *People v Wisniewski*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 361978); slip op at 7. "Preliminary questions of law, including whether a rule of evidence precludes the admission of evidence, are reviewed de novo." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013). Whether a defendant's constitutional right to confrontation has been violated is also a question of law that is reviewed de novo, meaning that "we review the issue independently without deference to the lower courts." *People v Washington*, 514 Mich 583, 592; 22 NW3d 507 (2024).

The United States and Michigan Constitutions protect a defendant's right to confront the witnesses against him. US Const, Am VI; Const 1963, art 1, § 20. "The right of confrontation [e]nsures that [a] witness testifies under oath at trial, is available for cross-examination, and allows the [factfinder] to observe the demeanor of the witness." *Washington*, 514 Mich at 592 (quotation marks and citation omitted). In general, this right bars the use of a witness's testimonial statements if the witness is unavailable for trial unless the defendant had a prior opportunity to cross-examine the witness. *Crawford v Washington*, 541 US 36, 59; 124 S Ct 1354; 158 L Ed 2d 177 (2004). "A statement is testimonial if it was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Washington*, 514 Mich at 592-593 (cleaned up).

The prosecution first experienced problems locating McCormick when he did not initially appear for defendant's preliminary examination in July 2019. McCormick, however, eventually appeared and testified at the examination. About a month before the scheduled trial date in May 2022, the prosecution, through the assistance of the lead investigating detective, began efforts to locate McCormick. The detective could not find McCormick at his last known address in Detroit

---

[7] Our Supreme Court revised the Michigan Rules of Evidence effective January 1, 2024. See 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of defendant's trial.

and, after further investigation, she eventually determined that he was in Georgia. The prosecution asked the court to declare McCormick unavailable under MRE 804(a)(5) and admit his testimony from the preliminary examination. Defendant opposed this and wanted McCormick produced to testify in person. There were then multiple adjournments to give the prosecution time to produce McCormick as a witness. Georgia officials assisted the prosecution in locating McCormick and bringing him to a Georgia court, but he was not held in custody because he had assured the judge in Georgia that he would voluntarily appear at defendant's trial in Michigan pursuant to the prosecution's subpoena. On the date that McCormick was supposed to testify, however, the prosecution learned that he had not stayed in the hotel or boarded the flight to Detroit that the prosecution had arranged for him. The prosecution and the detective thereafter attempted to contact McCormick to discuss his failure to appear, but McCormick had disconnected his phone number. The police in Georgia also made several attempts after this to locate McCormick to take him into custody for failing to comply with the subpoena, but they were never able to locate him. The trial court eventually found that McCormick was unavailable and that the prosecution had exercised due diligence to produce him, and it allowed the prosecution to introduce his testimony from defendant's preliminary examination at trial.

As noted, defendant first argues that the trial court erred when it found that McCormick was unavailable to testify because the prosecution did not exercise due diligence to locate and produce him for trial. According to defendant, the prosecution knew that McCormick was an uncooperative witness and should have begun to search for him more than a month before the scheduled trial date.

For a witness to be deemed unavailable under MRE 804(a)(5), "the prosecution must have made a diligent good-faith effort in its attempt to locate [the] witness for trial." *Bean*, 457 Mich at 684. This test "is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *Id*.

We see no error in the trial court's determination that the prosecution's efforts to locate and produce McCormick for trial satisfied this test. Although the record shows that McCormick was uncooperative early on in the case, he eventually agreed to testify at the preliminary examination, and there is nothing in the record that indicates McCormick was thereafter going to leave Michigan and evade testifying as a witness. As soon as the trial court scheduled a start date for trial—which occurred about one month before the trial began—the prosecution immediately made efforts to locate and subpoena McCormick.

When it became apparent that McCormick was no longer at his last known address, the prosecution was given additional time to locate him because defendant—consistent with his rights—wanted McCormick to testify in person. See generally US Const, Am VI; Const 1963, art 1, § 20. McCormick, however, actively took steps to avoid appearing at defendant's trial to testify. When Georgia police found him, he repeatedly made clear to them that he wanted nothing to do with defendant's trial. When brought before the court in Georgia, he represented that he would voluntarily appear to testify in this matter pursuant to the prosecution's subpoena—which, under the procedures in place in Georgia, meant that he could not be detained by police in the interim. The prosecution thereafter provided McCormick with a hotel room and a flight to Detroit so that he could appear for trial and confirmed with McCormick and his attorney in Georgia that he still

-9-

planned on appearing at trial. McCormick's representations to the court and prosecution, however, proved dishonest; he did not appear as promised, and he disconnected his phone number so that he could no longer be contacted. The Georgia police then made multiple attempts to find McCormick to take him into custody after he did not voluntarily comply with the subpoena issued by the Georgia court. While it would have been preferable for McCormick to be taken into custody on a witness detainer as soon as he was located in Georgia to ensure his appearance at trial, as the trial court recognized, the prosecution had to abide by the procedures in place in Georgia, which did not allow for it.

Although it may now seem apparent to defendant, with the benefit of hindsight, that the prosecution should have done more to keep track of McCormick and produce him as a witness, the test is whether diligent, good-faith efforts were made to produce a witness, "not whether more stringent efforts" would have actually produced the witness. *Bean*, 457 Mich at 684. On the record before us, we cannot say that the trial court erred by concluding that the prosecution exercised due diligence in attempting to locate and produce McCormick for trial, see *id.*, and by correspondingly concluding that McCormick was an unavailable witness under MRE 804(a)(5), see *Burns*, 494 Mich at 110.

Defendant also argues that even if McCormick was unavailable to testify, the trial court should not have admitted his preliminary examination testimony under MRE 804(b)(1), and doing so violated defendant's confrontation rights, because defendant's previous attorney did not have a similar motive when cross-examining McCormick at the preliminary examination as defense counsel had at the time of trial. We disagree.

Defendant's arguments on this point focus on the different stakes, strategic judgments, and burdens of proof that may generally attend a preliminary examination compared to trial. To the extent defendant suggests that preliminary-examination testimony is per se inadmissible at trial under MRE 804(b)(1) or the Confrontation Clause due to the general differences between those stages of proceedings, this Court has repeatedly rejected any such notion. See, e.g., *People v Garay*, 320 Mich App 29, 37-39; 903 NW2d 883 (2017), rev'd in part on other grounds by 506 Mich 936 (2020); *People v Wood*, 307 Mich App 485, 517-518; 862 NW2d 7 (2014), rev'd in part on other grounds by 498 Mich 914 (2015); *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009); *People v Adams*, 233 Mich App 652, 659-660; 592 NW2d 794 (1999). And defendant does not identify anything about the particulars of this case that would warrant a different conclusion.

Defendant's preliminary examination involved the same offenses for which he was later tried, and his fundamental interest at the preliminary examination was the same as at trial: to establish that he was not the individual who committed the shooting. Indeed, at the preliminary examination, defendant's attorney cross-examined McCormick about the Cadillac, his ability to see or identify the driver, and his failure to identify Howard as the passenger when asked to do so at a previous hearing. Defendant does not argue that the district court limited the scope of this cross-examination or that his attorney was prohibited from developing any areas of testimony. And while defendant may now be dissatisfied with the extent to which his attorney cross-examined McCormick, we fail to see, in that dissatisfaction, any basis to conclude in this case that defendant lacked the opportunity or a sufficiently similar motive to conduct that cross-examination. Accordingly, the trial court did not erroneously admit McCormick's preliminary examination

testimony at trial under MRE 804(b)(1), and the court's decision to do so did not violate defendant's confrontation rights.

## IV. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that his trial counsel was ineffective for: (1) failing to object to the hearsay statements that were included in McCormick's preliminary examination testimony and admitted at trial, and (2) failing to object to implied hearsay that resulted from the detective's testimony regarding the two anonymous tips. Whether counsel was ineffective presents a mixed question of fact and law, with factual findings reviewed for clear error and questions of law reviewed de novo. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016).

"To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Id.* This Court presumes counsel was effective, and a defendant carries a heavy burden to overcome that presumption. *People v Muniz*, 343 Mich App 437, 448; 997 NW2d 325 (2022). "Reasonable probability means a probability sufficient to undermine confidence in the outcome." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022) (quotation marks and citation omitted). The defendant bears the burden of establishing the factual predicate of his claim. *People v White*, 331 Mich App 144, 148; 951 NW2d 106 (2020).

### A. MCCORMICK'S TESTIMONY

Defendant takes issue with McCormick's testimony that Howard told him that she was looking for Weaver because Weaver had shot at her during an argument the night prior. Defendant posits that, had his counsel objected to this testimony, it would have been excluded as hearsay.

" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is generally inadmissible unless the rules of evidence provide otherwise. MRE 802. McCormick's testimony about Howard's statements to him, however, were not hearsay. MRE 801(d)(2)(E) provides that a statement is not hearsay if it is offered against the opposing party and it was made by the opposing party's coconspirator "during the course and in furtherance of the conspiracy on independent proof of the conspiracy." For this exception to apply, the proponent of the statement (1) "must establish by a preponderance of the evidence that a conspiracy existed through independent evidence," which may be circumstantial or inferential in nature; (2) "must establish that the statement was made during the course of the conspiracy"; and (3) "must establish that the statement furthered the conspiracy," a requirement that "has been construed broadly." *People v Martin*, 271 Mich App 280, 316-317; 721 NW2d 815 (2006). "A conspiracy exists where two or more persons combine with the intent to accomplish an illegal objective," and it continues "until the common enterprise has been fully completed, abandoned, or terminated." *Id.* at 317 (quotation marks and citation omitted)

Here, Howard was charged as a codefendant in connection with Weaver's shooting in separate proceedings. At defendant's trial, the prosecution's theory of the case was that Howard and defendant had conspired, and had thereafter acted together, to shoot Weaver. The prosecution also put forth independent evidence of this. Weaver's mother testified that Weaver had an "on again/off again" relationship with a woman she knew as "Lasha," who had long red hair and a phone number ending in 4252, and investigating officers testified that they eventually determined that that number belonged to Howard. Officers also testified that numerous text messages were exchanged between Howard's and defendant's phone numbers, that both defendant's and Howard's phone numbers were in the area of the shooting at the time of the shooting, that defendant's and Howard's social media accounts indicated that they were in a dating relationship, and that Howard was the mother of defendant's two children. Although McCormick could not identify Howard by name, he testified that the woman in the black Cadillac he had encountered hours before the shooting had red hair and that he had recognized her as Weaver's girlfriend. And although he could not identify defendant as the shooter, McCormick testified that he saw a man in the driver's seat wearing dark clothes and a "hoodie," with his hand on a long gun that was resting between himself and Howard. Testimony from several eyewitnesses and investigating officers, as well as some of the surveillance footage, established that a man wearing dark clothing, including dark sweatpants and a hooded sweatshirt, ran from a black Cadillac toward Weaver's car with a long gun to commit the shooting; that a black Cadillac had fled the scene immediately after the shooting; and that a black Cadillac was seen circling around several times in the neighborhood where the shooter had fled. This evidence was more than sufficient to establish by a preponderance of the evidence that defendant and Howard had "combine[d] with the intent to accomplish an illegal objective," i.e., fatally shoot Weaver. *Id.*

It is also clear from this evidence that Howard's statements to McCormick were made during the existence and in furtherance of the conspiracy. As discussed, Howard made the statements while sitting in the passenger seat of a black Cadillac with a dark-dressed man in a hooded sweatshirt—and a long gun resting between the two of them—in the general area of the shooting only hours before Weaver was fatally shot. During this time, Howard—who, according to McCormick, looked and sounded angry at that time—asked McCormick if he knew where Weaver was, stating that she was looking for Weaver because he had shot at her during an argument the night prior. Broadly construed, Howard's statements, which clearly conveyed that Howard and the man driving the Cadillac were looking for Weaver and why they were looking for him at that time, advanced the conspiracy because they assisted in obtaining information about Weaver's whereabouts so that the fatal shooting could be effectuated. See *id.* Accordingly, Howard's statements were admissible under the coconspirator exception to hearsay, MRE 801(d)(2)(E), and defense counsel cannot be deemed constitutionally ineffective for failing to raise a fruitless or meritless objection on that basis, see *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## B. ANONYMOUS TIPS

Defendant's claim of ineffective assistance regarding the anonymous tips is also unavailing. On appeal, defendant does not argue that his trial counsel was ineffective for failing to object to the admission of the substance of the two anonymous tips as evidence at trial. Indeed, defendant acknowledges—and the record reflects—that the substance of the anonymous tips was

not directly admitted as evidence because his counsel objected to their admission and the trial court ultimately concluded that they constituted inadmissible hearsay. Rather, defendant argues that the detective's testimony regarding the tips amounted to inadmissible implied testimonial hearsay, and his trial counsel was ineffective for failing to object to that testimony. Defendant asserts that he was prejudiced by any mention of the tips because the court could still infer what information was conveyed to the detective by the unknown sources, which tainted the court's ability to accurately identify the shooter. Defendant opines that this error was "especially pernicious" because the implied testimonial hearsay effectively circumvented his confrontation rights, as he had no opportunity to "test the anonymous tipster's credibility" through cross-examination.

As support, defendant relies on *Washington*, 514 Mich 583, in which our Supreme Court addressed whether an officer's trial testimony regarding a border agent's statement that he had acquired a bulletproof vest from the defendant—the basis for the charged offense—violated the Confrontation Clause because it constituted inadmissible " 'implied testimonial hearsay.' " The Court held that the agent's out-of-court statement was testimonial and that the officer's testimony had implicitly introduced the substance of the agent's statement—that the defendant possessed the vest when he encountered the agent. *Id*. at 593-597. The Court further held that the statement was offered as substantive evidence to prove the truth of the matter asserted, i.e., that the defendant possessed the vest. *Id*. at 597-600. The Court concluded that, because the defendant was unable to test the veracity of the agent's statement through cross-examination, admission of this implied testimonial hearsay violated the defendant's confrontation rights. *Id*. at 601-604. In so doing, the Court distinguished *People v Chambers*, 277 Mich App 1; 742 NW2d 610 (2007), "where the FBI agent's statement that identified the defendant in a photograph was merely introduced to explain why the officers undertook further investigation that led to the discovery of substantive evidence." *Washington*, 514 Mich at 600.

Here, defendant has not shown that the detective impermissibly implied the substance of the anonymous tips through her testimony. Cf. *id*. at 593-597, 604. Regarding the first tip, the detective's testimony only discussed her investigation of the information provided in the note left at the police station. Specifically, the detective testified that while she was investigating the crime scene hours after the shooting, she received information from the police station that "somebody had came [sic] in and left some information regarding the shooting" and that that information had led her to further investigate specific social media accounts—"Zusslashay" and "Dexterdrestandalone"—to determine if there was any "connection" between those accounts and Weaver. This testimony did not imply that either of those accounts had belonged to the shooter or had even belonged to defendant, only that they were possibly connected to this case.

The same holds true of the second anonymous tip. There was no testimony offered at trial regarding what the anonymous resident—or any resident in the area—told the detective during her follow-up investigation in the neighborhood. The detective only testified that, after reviewing the surveillance video from the party store, she canvassed the neighborhood in the area she believed the suspected shooter had fled, and that she had reviewed surveillance video from around the time of the shooting captured by a house on Coyle Street. The detective further testified that her review of the surveillance footage from the Coyle Street house led her to continue to canvas the area and speak to residents in the area. This, in turn, eventually led the detective to a house two blocks east of Coyle Street on the corner of Marlowe and Florence Streets, where she reviewed more surveillance video footage captured around the time of the shooting.

-13-

Contrary to defendant's assertions on appeal, none of this testimony regarding the detective's investigation implicitly introduced the substance of the anonymous sources' statements as proof of defendant's guilt. See *id*. at 593-597. Accordingly, defendant has failed to show that counsel was ineffective for failing to object on that basis (in addition to the grounds on which counsel had already successfully objected to the tips' admission). See *Ericksen*, 288 Mich App at 201.[8] Furthermore, defendant has failed to show how, had the detective's testimony regarding the tips been limited even further than it already had been, a different outcome would have been reasonably probable in light of the other, untainted evidence of defendant's guilt. See *Shaw*, 315 Mich App at 672.

## V. SPEEDY TRIAL

Defendant argues, in both his appellate brief and his supplemental Standard 4[9] brief, that his speedy-trial rights were violated. In his appellate brief filed by counsel, defendant argues that he was deprived of his right to a speedy judgment because it took over seven months to complete his trial. In his Standard 4 brief, defendant argues that his approximately 36-month pretrial delay deprived him of his right to a speedy trial.

Because defendant did not formally demand a speedy trial or judgment below, this issue is unpreserved. See *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999). Unpreserved claims of error are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To obtain appellate relief under the plain-error standard, the defendant must show: (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *Id*. at 763. To satisfy the third element, the defendant generally must show that the error "affected the outcome of the lower court proceedings." *Id*. And even when these three requirements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Allen*, 507 Mich 597, 614; 968 NW2d 532 (2021) (quotation marks and citation omitted).

A criminal defendant's right to a speedy trial is guaranteed by the United States and Michigan Constitutions, statute, and court rule. See US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; MCR 6.004(A). "The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006) (quotation marks and citation omitted). To determine whether a defendant has been denied the right to a speedy trial, a court must balance the four factors set forth in *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972): "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 3

---

[8] It also bears noting that our Supreme Court's decision in *Washington*, the key authority on which defendant bases his claim of ineffective assistance, was not issued until well after defendant's trial.

[9] Defendant filed a supplemental Standard 4 brief pursuant to Michigan Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004).

-14-

(quotation marks and citation omitted).[10] When the length of the delay is less than 18 months, prejudice is not presumed, and the necessity of reviewing the remaining *Barker* factors depends on the circumstances of the case. See *People v Collins*, 388 Mich 680, 688-690; 202 NW2d 769 (1972) (quoting *Barker*, 407 US at 530, for the proposition that " '[u]ntil there is some delay which is presumptively prejudicial there is no necessity for inquiry into the other factors that go into the balance' " and noting that a delay of 18 months or more is presumptively prejudicial). But when the length of the delay has been more than 18 months, "prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Williams*, 475 Mich at 262.

Furthermore, our statutes and court rules recognize that the right to a speedy trial includes the right to a speedy judgment. MCL 768.1 (providing that an individual is entitled to both "a speedy trial and determination" and that public officers involved in the case must "bring such case to a final determination without delay except as may be necessary to secure to the accused a fair and impartial trial"); MCR 6.004(A) (providing that an individual is entitled to both "a speedy trial" and "a speedy resolution of all matters before the court"). This Court has also recognized as much. See *People v Hammond*, 84 Mich App 60; 269 NW2d 488 (1978). In *Hammond*, *id*. at 64-66, this Court addressed whether the defendant's trial, which had commenced within six months of his arrest but still "had not concluded 27 months after arrest," had violated the defendant's right to a speedy trial as a "failure to receive a speedy judgment." This Court held that the right to a speedy trial also extends to a speedy judgment or resolution of a case against a defendant. *Id*. at 66. This Court reasoned that cases involving an undue delay between the commencement of a defendant's criminal trial and the final judgment against him or her were analogous to "cases involving undue delay between arrest and commencement of trial," and so although "[s]peedy trial cases have for the most part focused on either the length of time between the defendant's arrest and trial or the length of time between indictment and arrest," that caselaw—including the four *Barker* factors—similarly applied to speedy-judgment claims. *Id*. at 66-67.

Here, when applying the *Barker* factors to defendant's speedy-judgment claim, it is apparent that defendant cannot show that his right to a speedy judgment was violated. Defendant's trial, once commenced, took over seven months to complete. Although this delay was significant, it is below the 18-month threshold at which prejudice is presumed. See *Williams*, 475 Mich at 262. Additionally, the record makes clear that much of this delay was at least partially attributable to defendant's actions throughout trial, including multiple adjournments that were either stipulated to by defendant or the direct result of defendant's insistence that both McCormick and Mathis be

---

[10] Although defendant, in his appellate brief, urges us to adopt a different standard for this state's constitutional right to a speedy trial, Const 1963, art 1, § 20, we must follow the long line of cases that have adopted the *Barker* factors when resolving speedy-trial issues raised in this state. See, e.g., *Collins*, 388 Mich at 682, 688-695; *Smith*, ___ Mich App at ___; slip op at 3. See also *People v Armisted*, 295 Mich App 32, 53; 811 NW2d 47 (2011) ("[T]his Court is without authority to reverse decisions of the Michigan Supreme Court."); MCR 7.215(C)(2) ("A published opinion of the Court of Appeals has precedential effect under the rule of stare decisis.").

produced to testify at trial in person.[11]  See *Cain*, 238 Mich App at 113; *Hammond*, 84 Mich App at 67.  The remainder of the delay is "technically attributable to the prosecution" because it was the result of matters such as scheduling delays and docket congestion "inherent in the court system," but those delays "are given a neutral tint and are assigned only minimal weight" in the speedy-trial analysis.  *Smith*, ___ Mich App at ___; slip op at 3 (quotation marks and citation omitted).  And defendant did not assert his right to a speedy judgment, which weighs against him.  See *Williams*, 475 Mich at 263.

It is also apparent that, when applying the *Barker* factors to defendant's speedy-trial claim, the pretrial delay did not violate defendant's speedy-trial rights.  Defendant was arrested in May 2019, and his trial did not commence until May 2022, resulting in approximately a 36-month delay.  This delay is certainly significant and well more than the 18-month threshold at which prejudice is presumed.  See *Williams*, 475 Mich at 262.  But at least 18 months of the pretrial delay is attributable to defendant due to his significant pretrial motion practice, which included a motion to quash the information, a motion by his counsel to withdraw, three motions in limine, at least five motions to suppress evidence, and motions for bond reduction or for pretrial release, as well as his decision to waive a jury trial and instead proceed with a bench trial.  See *Cain*, 238 Mich App at 113; *Hammond*, 84 Mich App at 67.  A few months of the delay are attributable to the prosecution due to its motion practice, and some of the remaining portion of the delay is "technically attributable to the prosecution" because it was the result of matters such as scheduling delays and docket congestion "inherent in the court system." *Smith*, ___ Mich App at ___; slip op at 3.  But an overwhelming majority of the remainder of the pretrial delay was due to the COVID-19 pandemic, which is "not attributable to the prosecution for purposes of a speedy-trial claim," *id*. at ___; slip op at 5.  And, as with his speedy-judgment claim, defendant did not assert his right to a speedy trial, which weighs against him.  See *Williams*, 475 Mich at 263.

Finally, regarding prejudice as to both of defendant's claims, a defendant may experience two types of prejudice: "prejudice to his person and prejudice to the defense." *Williams*, 475 Mich at 264 (quotation marks and citation omitted).  Although both types must be considered, "the most serious inquiry is whether the delay has impaired the defendant's defense." *People v Simpson*, 207 Mich App 560, 564; 526 NW2d 33 (1994).  This is because "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Williams*, 475 Mich at 264 (quotation marks and citations omitted).

In his appellate brief, defendant fails to explain how he was prejudiced by the length of time it took to complete his trial, other than claiming he suffered additional stress while waiting in jail during the time his trial was pending.  Similarly, in his Standard 4 brief, defendant primarily

---

[11] The issues surrounding McCormick's availability were already discussed *supra*.  Regarding Mathis, the record reflects that trial had been adjourned for about two months, in part, because Mathis was sick from COVID-19 and unavailable to testify in person as a result, but defendant still wanted live testimony from her.  The trial was later adjourned twice more, for a total of almost three months, because Mathis was recovering from injuries resulting from a serious car accident and was therefore again unavailable to testify in person, but defendant objected to having her prior testimony read into the record or allowing her to testify via Zoom in lieu of live testimony.

-16-

asserts that he was prejudiced by the length of the pretrial delay because he had to wait in jail during that time, which caused him significant anxiety and "extreme emotional distress." While we do not doubt that defendant may well have experienced anxiety and emotional distress from his incarceration throughout the proceedings, that "alone cannot establish a speedy-trial violation." *Smith*, ___ Mich App at ___; slip op at 6. And although defendant, in his Standard 4 brief, attempts to argue that he suffered prejudiced to his defense by asserting that there were several exculpatory witnesses, including Howard and some of Howard's friends, that could not testify at his trial, he fails to explain how their testimony would have been exculpatory or how their absence at trial was due to the delay. Nor does defendant offer anything to suggest that he had ever intended to call these individuals as witnesses at trial. On this record, we cannot conclude that defendant has shown he suffered any prejudice to his defense, let alone prejudice sufficient to entitle him to relief. See *People v Chism*, 390 Mich 104, 115; 211 NW2d 193 (1973) ("[O]n the matter of prejudice to [the] defendant because of the length of time before his trial, the most important thing is that there is no evidence that a fair trial was jeopardized by delay[.]"). Accordingly, defendant's claims of speedy-judgment and speedy-trial violations fail. See *Williams*, 475 Mich at 262; *Collins*, 388 Mich at 688-690.

## VI. RIGHT TO A JURY TRIAL

Related to his claim of a speedy-trial violation, defendant, in his Standard 4 brief, argues that the long delay in bringing his case to trial is what caused him to waive his right to a jury trial and instead agree to a bench trial, so that his case would be heard sooner. Thus, defendant argues, his waiver of a jury trial was involuntary, and the trial court erred by accepting the waiver. Ordinarily, we review a trial court's determination regarding whether a defendant validly waived his constitutional right to a jury trial for clear error. *People v Lafey*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 361936); slip op at 5. But because defendant failed to preserve this constitutional issue by raising it in the trial court, we review it for plain error affecting substantial rights. See *id*. at ___; slip op at 5; see also *Carines*, 460 Mich at 763-764.

At a review hearing in February 2022, defense counsel presented to the trial court a document waiving a trial by jury and electing to instead be tried without a jury, which had been signed by defendant shortly before the hearing. Defense counsel explained that "it was [defendant's] initial idea to proceed by bench trial," and because this was a decision that he left to defendant's discretion, he had given defendant "a few weeks to [thoroughly] think about" it. Counsel stated that, after he had given defendant that time to consider his decision, it was, "in fact, [defendant's] demand [that] this case proceed by a bench trial." Counsel nonetheless asked the court "to make sure it's [defendant's] voluntary decision to do this," so the court placed defendant under oath and questioned him about his waiver. In response to the court's questions, defendant informed the court that he understood that he had the constitutional right to a jury trial; that he wanted to waive this right and had signed a waiver form to do so; that he made that decision of his own free will; that no one threatened or forced him to waive his right to a jury trial; and that nobody promised him any particular result if he waived his right to a jury trial. After confirming with the parties that neither objected to a waiver, the court found that defendant had knowingly and voluntarily waived his right to a jury trial in accordance with our statutes and court rules.

"A criminal defendant has a constitutionally guaranteed right to a jury determination that he is guilty beyond a reasonable doubt," but "with the consent of the prosecutor and the approval

of the trial court, a defendant may waive his right to a jury trial." *People v Cook*, 285 Mich App 420, 422-423; 776 NW2d 164 (2009); see also US Const, Am VI; Const 1963, art 1, § 20. "To validly waive the right to a jury trial, that waiver must be both knowingly and voluntarily made." *Lafey*, ___ Mich App at ___; slip op at 5 (quotation marks and citation omitted). MCR 6.402 governs such a waiver and provides, in relevant part:

> (B) Waiver and Record Requirements. Before accepting a waiver, the court must advise the defendant in open court of the constitutional right to trial by jury. The court must also ascertain, by addressing the defendant personally, that the defendant understands the right and that the defendant voluntarily chooses to give up that right and to be tried by the court. A verbatim record must be made of the waiver proceeding.

"Complying with the requirements of MCR 6.402(B) creates a presumption that a defendant's waiver was voluntary, knowing, and intelligent." *Lafey*, ___ Mich App at ___; slip op at 6 (quotation marks and citation omitted).

The record in this case supports that defendant knowingly, voluntarily, and intelligently waived his right to a jury trial. Defense counsel indicated that the idea to waive the right to a jury trial was first raised by defendant, that he gave defendant additional time to further consider that decision, and that defendant still wished to waive his right to a jury trial and had signed the waiver form indicating as much shortly before the review hearing. Then, in accordance with MCR 6.402(B), the court placed defendant under oath and questioned him to determine if his waiver was knowing and voluntary, during which time defendant testified that he was not threatened or forced, and had instead chosen, to waive a jury trial, despite knowing that he had the constitutional right to one. And even if the pretrial delays—which, as discussed above, did not amount to a speedy-trial violation—somehow factored into defendant's decision to waive a jury trial, defendant fails to explain how that, in itself, would demonstrate that the court should not have accepted his waiver. Accordingly, on this record, defendant has not shown that the trial court plainly erred by accepting his waiver of a jury trial. See *id.* at ___; slip op at 5, 8.

## VII. PUBLIC TRIAL

Defendant also argues in his Standard 4 brief that he was denied a public trial. Because defendant failed to raise an objection on this ground below, this issue is unpreserved and thus reviewed for plain error affecting substantial rights. See *People v Davis*, 509 Mich 52, 64-65, 67-68; 983 NW2d 325 (2022).

"Both the United States Constitution and the Michigan Constitution guarantee a criminal defendant the right to a public trial." *Id.* at 66, citing US Const, Am VI; Const 1963, art 1, § 20. This requirement "is for the benefit of the accused," as it ensures a fair trial by seeing to it that the presiding judge and the prosecution carry out their respective duties responsibly. *Id.* (quotation marks and citation omitted). A public trial also "encourages witnesses to come forward, and discourages perjury." *Id.* "Despite serving these important interests, the public-trial right is not unlimited, and circumstances may exist that warrant the closure of a courtroom during any stage of a criminal proceeding." *Id.* To justify closure of the courtroom, however, "there must be an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to

-18-

protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id*. at 66-67 (quotation marks and citations omitted). See also generally MCR 8.116(D) (setting forth procedures for courts to follow when limiting access to court proceedings).

Although it is somewhat unclear, defendant appears to argue that he was denied a public trial because, after hearing the parties' closing arguments but before adjourning to review the evidence to make its findings, the court stated that it was seeing some of the trial exhibits for the first time because they were admitted as evidence in an "exhibit book," but not "published during the trial." It is unclear how this comment in itself establishes that defendant was denied his right to a public trial. And when looking at this comment in context, the court indicated that it had admitted a "large amount of evidence" throughout trial, some of which the court had not yet had a chance to fully review simply because it had not been published before closing arguments, but that the court had taken "voluminous notes" throughout trial so that it could more thoroughly review all of the properly admitted evidence before rendering a verdict. Indeed, the court made clear that it had intentionally waited until the end of the trial to go through those items, which were compiled for the court into an exhibit book. Importantly, it is clear from the court's statements that even if certain admitted evidence was not published for the court to see during the parties' cases-in-chief, those pieces of evidence were nonetheless published for it to see during closing arguments. It is therefore apparent that the public could view that evidence at the same time that the court did. Furthermore, defendant does not assert that the court had ever closed the courtroom, nor is there anything in the record to suggest that the court had closed the courtroom or otherwise made defendant's trial proceedings unavailable to the public at large. Accordingly, defendant has not demonstrated that he is entitled to relief on this basis. See *Davis*, 509 Mich at 64-65, 67-68.

## VIII. NEWLY DISCOVERED EVIDENCE

Finally, defendant argues in his Standard 4 brief that he is entitled to a new trial, or at minimum an evidentiary hearing, because he has newly discovered evidence from Lark identifying somebody else as Weaver's shooter. A new trial may be granted on the basis of newly discovered evidence if the defendant shows that: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (quotation marks and citations omitted). Because defendant failed to move for a new trial on this basis, this issue is unpreserved and is thus reviewed for plain error affecting substantial rights. *People v Cox*, 268 Mich App 440, 450; 709 NW2d 152 (2005).

Defendant has not shown that he is entitled to a new trial on this basis. To start, defendant has not properly shown that Lark actually has offered new proposed testimony that someone else was responsible for the shooting. Although defendant suggests that Lark signed an affidavit detailing his new proposed testimony, neither that affidavit nor any other offer of proof has been presented to this Court. In any event, Lark had been a known witness since the start of this case and was, in fact, called as a witness at trial—he was simply held in contempt for refusing to answer questions about the shooting and instead asserting his right to remain silent under the Fifth Amendment, despite the trial court ordering him to answer because his responses did not expose him to possible criminal liability. Defendant has not explained why Lark's more recent availability

makes his proposed testimony newly discovered evidence that could not have been produced earlier through reasonable diligence. See *Cress*, 468 Mich at 692. Additionally, per defendant's argument, Lark's purported new testimony is based on his apparent decision to no longer assert his constitutional right to remain silent—a decision that did not occur until well after trial concluded and therefore would not support the grant of a new trial. See *People v Rogers*, 335 Mich App 172, 195-196; 966 NW2d 181 (2020). Such testimony cannot be considered newly discovered, but rather, at best, newly available, which is insufficient to warrant a new trial. See *Cress*, 468 Mich at 692; *People v Terrell*, 289 Mich App 553, 567-568; 797 NW2d 684 (2010). Accordingly, defendant has not shown that he is entitled to relief under the plain-error standard. See *Cox*, 268 Mich App at 450.

Affirmed.

/s/ Michael J. Riordan
/s/ Kristina Robinson Garrett
/s/ Philip P. Mariani